RHODE ISLAND AFFILIATE, AMERICAN CIVIL LIBERTIES UNION, INC.

v.

RHODE ISLAND LOTTERY COMMISSION and Peter J. O'Connell.

Civ. A. No. 78–0604 P.

United States District Court,
D. Rhode Island.

Dec. 16, 1982.

Matthew F. Medeiros, of Edwards & Angell, Providence, R.I., for plaintiff.

John P. Hawkins, Providence, R.I., for defendants.

## OPINION

PETTINE, Senior District Judge.

 This action arises out of an application by the American Civil Liberties Union ("ACLU") for permission to conduct a charitable raffle. The ACLU claims that the Rhode Island Lottery Commission ("Commission") and its director, Peter J. O'Connell, unconstitutionally denied it a license. It seeks both damages and equitable relief for the violation of its federal constitutional rights to freedom of association, freedom of speech, substantive due process and the equal protection of the laws, under the First and Fourteenth Amendments.[1] The ACLU also has alleged that the Commission and its director have violated its rights under state law. The Court has jurisdiction over the federal claims under 28 U.S.C. § 1343(a)(3) (1981 Supp.),[2] and has pendent jurisdiction over the state law claims.[3]

Defendants deny that they have violated any of the plaintiff's constitutional rights. They also assert various other defenses. First, they claim that the Commission is entitled to Eleventh Amendment immunity from suit in federal court. Second, they contend that the suit cannot properly be brought under 42 U.S.C. § 1983. Finally, they claim that Mr. O'Connell is entitled to qualified immunity from damages and

1. The ACLU alleged in its complaint a violation of procedural due process. The ACLU, however, failed to brief this issue in its pre-trial and post-trial briefs, and the Court assumes that it has abandoned this claim.

2. Title 28 U.S.C. § 1343(a)(3) (1981 Supp.) provides:

 The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

 .　　.　　.　　.　　.

 (3) To redress the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States....

 The Civil Rights Act of 1871 is one such Act of Congress. See Quern v. Jordan, 440 U.S. 332, 351 n. 3 & 357, 99 S.Ct. 1139, 1142 n. 3 & 1153, 59 L.Ed.2d 358 (1979) (Brennan, J. concurring). There are two basic jurisdictional requirements for an action under 42 U.S.C. § 1983: the plaintiff must allege that he was deprived of a federal right by a defendant who is a "person" within the meaning of § 1983, and plaintiff must allege that the defendant acted "under color of state law." See Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). Because this Court has concluded that both of these jurisdictional requirements have been satisfied, see pp. 23–26 infra, it follows that the Court has jurisdiction to hear this case under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(a)(3).

3. The ACLU contends that O'Connell has violated Rhode Island law and is, therefore, personally liable. It contends that R.I.G.L. § 11–19–30.1 originally vested exclusive authority to license games of chance in the State Lottery Commission and that O'Connell had no authority to deny the ACLU's 1978 application because of the ACLU's failure to comply with the charitable gaming statute with respect to use of the 1977 event proceeds. The ACLU points to R.I.G.L. 11–19–30 (1981) which governs the licensing of beano and bingo games and which expressly provides that, "failure to comply strictly with the provisions of this section and of the terms and conditions of such licensing authority shall result in a revocation of such license ... and ... ineligibility to be licensed [thereafter] for a period of ninety days...." The ACLU contends that the absence of such specific language in R.I.G.L. § 11–19–30.1 indicates that O'Connell lacked authority to deny a license for failure to comply with the charitable gaming statute as to prior events. The ACLU also argues that O'Connell's interpretation of "charitable purpose" as excluding payment of salaries is erroneous under Rhode Island law.

 In Amoco Oil v. Local 99 Intern. Broth. of Elec. etc. 536 F.Supp. 1203, 1219–23 (D.R.I.1982), this Court engaged in an extensive exegesis of pendent jurisdiction. Amoco Oil recognizes that a federal court's decision to hear pendent state law claims is largely a matter of discretion. Although this Court has both Article III and statutory power to exercise pendent jurisdiction over the ACLU's state law claims, it exercises its discretion not to do so. Judicial convenience and economy may be served by taking pendent jurisdiction, but principles of comity weigh heavily against doing so. The pendent claims here involve pure interpretation of state statutes; though there is a common nucleus of operative facts with the federal claims, the parameters of the statutory interpretation can extend beyond the issues at stake here. This Court's pervasive interpretation of "charitable purpose" would be an unwarranted intrusion of the state's prerogative in the administration of local law. Accordingly, I decline to exercise jurisdiction over the ACLU's pendent state law claims.

therefore cannot be held personally liable for official acts that he did not have reason to know would be unconstitutional. Since the legal issues posed by this case are complex, it is necessary to set forth detailed background as to both the Commission and the facts surrounding its denial of the ACLU's application for a license.

*The Commission*

The Rhode Island Lottery Commission was created in May 1974. It consists of nine members and an executive director. R.I.G.L. § 42–61–1, 42–61–3 (1981). The majority leader of the Rhode Island Senate appoints three of the members, only two of whom may belong to the same political party. *Id.* § 42–61–1. The Speaker of the Rhode Island House of Representatives also chooses three of the members, only two of whom may belong to the same party. *Id.* Finally, the Governor appoints the three remaining Commission members from the general public. *Id.* The members serve for terms of three years, subject to summary removal by the appointing authority. *Id.*

The Governor also appoints the executive director of the Commission subject to the approval of a majority of the Commission. R.I.G.L. § 42–61–3. The executive director serves at the Commission's pleasure. *Id.* Unlike the nine Commission members, the director receives a salary. *Id.* This salary is set by the Commission and is not subject to review by either the Legislature or the Governor.

The Commission was established primarily to generate revenue for the State of Rhode Island through the operation of the state lottery. At the time of the incident

that is the subject of this lawsuit, the Commission also had authority to license charitable organizations to conduct raffles and other games of chance. This authority has subsequently been transferred to the Rhode Island State Police. R.I.G.L. § 11–19–30.1 (1981). The Commission, however, has retained its exclusive authority over the operation of the Rhode Island Lottery. To fulfill this responsibility, it is empowered to promulgate "rules and regulations relating to lotteries (and) . . . to make recommendations and set policy for lotteries. . . ." *Id.* § 42–61–2, and to determine *inter alia,* the "types of lotteries to be conducted", the price of tickets, the method of prize payment, the frequency of drawings, and the procedure for dealing with sales agents. *Id.* § 42–61–2(1), (2), (5), (6), (9), (10).

By statute, "all revenues received by the Commission from sales of lottery tickets and (sales agent) license fees" must be deposited in the "state lottery fund". *Id.* § 42–61–15. The state treasurer has custody of this fund, which is "subject to the direction of the Commission for [its] use . . . and money [is] disbursed from [the fund] on the order of the controller of the state, pursuant to vouchers or invoices signed by the director of the Commission." *Id.* At trial, O'Connell testified that the controller has disapproved the amount to be paid on certain invoices. He admitted, however, that no bills owed by the Commission have ever gone unpaid by the controller.

The Rhode Island Lottery Statute contains a formula governing the allocation of money in the state lottery fund. *Id.*[4] Un-

---

**4.** R.I.G.L. § 42–61–15 (1981) provides:

(1) Establishing a prize fund from which payments of the prize awards shall be disbursed to holders of winning lottery tickets on checks signed by the director and countersigned by the chairman or his designee. The payments of prize award to holders of winning lottery tickets shall be equal as nearly as is practicable, to forty-five per cent (45%) of the total revenue accruing from the sale of lottery tickets.

(2) Payment of expenses incurred by the commission in the operation of the state lotteries including but not limited to costs aris-

ing from contracts entered into by the director for promotional, consulting, or operational services, salaries of professional, technical and clerical assistants, and purchases or lease of facilities, lottery equipment and materials; and

(3) Repayment into the general revenue fund of the amount appropriated for the implementation of the state lottery;

(4) Payment into the general revenue fund of all revenues remaining in the state lottery fund after the payments specified in divisions (1), (2), and (3) of this section; provided, that the amount to be transferred into the general

der that formula, approximately 45 percent of the total revenue generated from the sale of lottery tickets must be set aside to establish a prize fund. The statute also provides that no less than 30 percent of the total revenue earned through operation of the lottery must be paid to the general revenue fund. The remaining 25 percent of the income earned from the sale of lottery tickets may be used for the payment of expenses incurred by the Commission. These expenses are defined as "including but *not limited* to costs arising from contracts ... for promotional, consulting, or operational services, salaries ..., and purchases and lease(s) ...." *Id.* § 42–61–15(2) (emphasis added.). Any revenue remaining after the payment of the Commission's expenses must be paid into the general revenue fund.

At trial, Counsel for the ACLU examined O'Connell extensively as to the Commission's financial position and the sources of revenue out of which a judgment against the Commission could be drawn. O'Connell testified that the Commission has repaid to the general revenue fund the amount initially appropriated by the State to set up the lottery. He further testified that in fiscal year 1980–1981 the Rhode Island Lottery generated approximately $36 million while the Commission's expenses were only $7 million. Thus, after deducting from total revenues 45 percent for prize awards, 30 percent for the minimum payment due the general revenue fund and $7 million for the Commission's expenses, $2 million remained in the Commission's coffers. O'Connell testified that the Commission retained $683,000 of this $2 million in the Lottery Fund to meet its operational expenses and turned the remainder over to the general revenue fund.

Counsel for the ACLU also asked O'Connell whether the State is obligated to "bail out" the Commission in the event it becomes financially troubled or goes bankrupt. At his deposition O'Connell stated that there were no "agreements or understandings with state government to bail out the (C)ommission." At trial, however, O'Connell claimed that the Governor had assured him at a state budget meeting that Rhode Island would pay prize awards if the Commission lacked sufficient funds. Nevertheless, he was uncertain whether the State would rescue the Commission from outright bankruptcy.

The Commission's regulations state that it is "an autonomous entity ... operated as an Enterprise Fund." Rhode Island Lottery Commission Rules and Regulations § 1.2(a) (1974). Furthermore, O'Connell testified at his deposition that the Commission "is essentially run like a private business;" it sets its own budget and determines what consultants to hire, how much advertising to do, and how much to expend for other purposes. In fact, the Commission has recently decided, without prior legislative or gubernatorial approval, to construct a new headquarters for itself at the cost of $900,000. Although the Commission has almost complete authority over its financial affairs, its executive director must report to the State on its financial affairs, R.I.G.L. § 42–61–4(8), and the state auditor general is required to conduct a semi-annual audit of its accounts. *Id.* § 42–61–15.

Unlike many state agencies, the actions of the Commission are not subject to review under the state's Administrative Procedures Act, R.I.G.L. § 42–35–18(a)(28) (1981), and its employees are not part of the state civil service system. Nevertheless, the Rhode Island Attorney General, in an opinion letter dated December 18, 1975 to the Rhode Island Equal Employment Office, concluded that the Commission was not exempt from a former governor's executive order stating that equal opportunity and affirmative action were to be the policy of "all units of Rhode Island State Government." Defendants' Ex. N.[5]

revenue fund shall equal no less than thirty per cent (30%) of the total revenue received and accrued from the sale of lottery tickets

plus any other income earned from the lottery.

**5.** The Attorney General reasoned as follows:

*Facts*

This case concerns an application for permission to hold a charitable raffle submitted to the Commission by the ACLU in July 1978. The application was made pursuant to R.I.G.L. § 11–19–30.1 which permits any religious, fraternal, civic, educational or veterans' organization to conduct certain authorized games of chance. The statute further provides that all the proceeds from the event, after the deduction of certain expenses, must be "applied and expended exclusively for charitable purposes".

It is not disputed that the ACLU is a non-profit corporation organized under Rhode Island law for the purpose of "maintaining, defending and advancing civil rights ... in Rhode Island and throughout the United States," ACLU Articles of Association, and is thus an eligible organization under R.I.G.L. § 11–19–30.1. Rather, the present dispute centers on the reasons why the ACLU's July 1978 application was denied. The Commission claims it denied this application because the ACLU's 1977 report on the use of the proceeds of a charitable raffle inadequately accounted for the expenditures from that raffle and because the ACLU's intended use of the proceeds of the 1978 raffle to pay part of the salary of its executive director violated the statutory requirement that proceeds be used for a "charitable purpose". The ACLU contends, on the other hand, that it was singled out for disparate and unfavorable treatment because of the controversial affiliations of the raffle host. The relevant facts with respect to this dispute are as follows.

When the ACLU applied for permission to hold a charitable raffle in 1977, the Commission expressed concern as to how the proceeds of such a raffle would be used. The ACLU's application specified that the proceeds would be expended "50% or $2000 as prize, 50% or $2000 to organization." Not satisfied with this explanation, James Connolly, the Commission's marketing manager, called Michael Dollinger, the ACLU's executive director at that time, and requested more specific information as to how the ACLU planned to use the proceeds. Dollinger advised that the monies received would go for "legal fees", "office upkeep" and "educational materials". Subsequently, on June 27, 1977, attorney Richard Zacks, the ACLU's treasurer, wrote to Connolly attempting to dispel any uncertainties concerning the ACLU's qualifications as a charitable organization. In this letter Zacks recounted a prior telephone conversation he had had on the issue with Bernard Gladstone, the Commission's attorney. Zacks recalled that:

> Mr. Gladstone and I discussed the Commission's concern that the net proceeds of the raffle be used, as required by statute, solely for charitable purposes. I was able to assure him that the entire proceeds of the proposed raffle, except for the prizes to be awarded and the expenses of printing tickets, would be applied and expend-

[I]t would appear clear that the Commission is not autonomous in the sense that it is free to govern itself. The purpose of its existence is premised upon a constitutional amendment permitting, with some exceptions, the conduct of a lottery by the State. Were the Lottery Commission to be declared free of State control, its operation would violate the terms of the constitutional amendment.
Its existence is dependent upon the General Assembly. Its conduct is regulated and its powers may be augmented or diminished by that same body. Its whole operation is spelled out in detail by the Lottery Act, including the term of office of each commission member. Its initial operation was funded by the State to be repaid out of lottery proceeds. The net proceeds are to be paid into the State for general revenue purposes.

The Lottery Commission has no indicia of autonomy in the sense of self governance. Only by grace of legislative mandate is it exempt from the Administrative Procedures Act. It has no power to sue or to be sued. Its only source of revenue are the monies derived from the sale of lottery tickets and licenses, both authorized by the General Assembly. It has no authority to borrow money.
In view of the foregoing, it would appear clear that the Lottery Commission is exercising a State function, the raising of revenue is subject to legislative control and, therefore, stands in no different posture legally than any other State department.
Defendants' Ex. N.

ed exclusively for the general charitable purposes of the American Civil Liberties Union, which are described in its Articles of Association as follows: [quoting from the Articles of Association, *supra* ].

By letter dated June 30, 1977 signed by defendant O'Connell, the Commission approved the plaintiff's application stating

In viewing the application and the investigative information that you have furnished to the Rhode Island Lottery, it appears that this non-profit organization shall use the proceeds for charitable purposes, as required by the Statute, and shall comply with the rules and regulations set forth by the Rhode Island Lottery, and therefore authorization is granted.

A notice which accompanied the letter read—

NOTICE

THE RULES AND REGULATIONS GOVERNING GAMES OF CHANCE REQUIRE FINANCIAL STATEMENTS WITHIN SIXTY (60) DAYS AFTER THE EVENT HAS BEEN HELD. PLEASE ITEMIZE YOUR GROSS RECEIPTS, TOTAL EXPENSES AND NET PROFIT AND MAIL TO THE RHODE ISLAND LOTTERY, 39 WARREN AVENUE, EAST PROVIDENCE, RHODE ISLAND 02914, ATTN: MR. JAMES T. CONNOLLY, WITHIN THE SIXTY (60) DAYS.

On July 31, 1977, the raffle was held in conjunction with a picnic; 133 tickets were sold grossing approximately $2660.00. The raffle and picnic netted about $1507—$1395 from ticket sales and the balance from contributions. As required, the ACLU reported to the Commission on the gross receipts, expenses and net profits of the raffle within sixty days of its occurrence. Subsequently, Mr. Connolly phoned Mr. Dollinger and requested an itemization of the expenses and receipts. Connolly also contends that he expressly told Dollinger that the Commission needed a breakdown as to the charitable purposes for which the proceeds of the raffle were to be spent. The ACLU denies that this latter request was ever made. It notes that its letter of September 26, 1977 responding to Connolly's request began by saying "[a]s requested by Jim Connolly, please accept this more ·detailed itemization of the July 31, 1977 raffle of the ACLU . . . .," and made no mention of a request for a breakdown of the charitable purposes to which the raffle proceeds would be devoted. Furthermore, the ACLU points out that the Commission did not seek any additional information and that it was not until after it had submitted another application to hold a raffle some ten months later that it was notified that it had allegedly failed to comply with Connolly's request.

The ACLU submitted to the Commission an application to hold a second raffle on July 13, 1978. This application was similar to its 1977 application. It stated that the proposed raffle would again be held at the home of Harvey and Jesse O'Connor and that the ACLU would use the raffle proceeds for "the charitable and educational activities of the organization."

The Commission officially rejected the ACLU's second application in a letter dated July 31, 1978. Referring to the alleged inadequacy of the ACLU's 1977 financial report, the Commission stated:

A review of the application and the facts set forth in your (sic) investigation of same requires the determination that the organization does not comply with the criteria set forth in 11–19–30.1 of the General Laws of Rhode Island, 1956 as amended, and therefore authorization is hereby denied.

After receiving this letter Mr. Zacks called the Commission to inquire further as to why the ACLU's application had been denied. Mr. Zacks was referred to Mr. Gladstone. According to the testimony of Mr. Zacks, Gladstone told him that the problem with the ACLU's 1978 application was the absence of information in the financial statements for the 1977 raffle as to the use of the proceeds. When Zacks replied that the ACLU had used the proceeds for the

general purposes of the organization, Gladstone stated that the Commission needed more detailed information—such as a list of the organizations to which the ACLU gave the proceeds. Zacks then responded that the ACLU had not given the proceeds to any organizations. At this point, he testified Gladstone replied:

> I might as well tell you the whole story. Wasn't Harvey O'Connor (the host for the 1977 raffle picnic and the proposed host for the 1978 event) a controversial figure, a communist or something?

Zacks testified that upon hearing this he asked Gladstone about the source of this information. Zacks first testified that Gladstone had said that O'Connor's political affiliations had come up at a meeting of the Commission, but subsequently he retracted this testimony and said that the issue "came up at the Commission."

Various members of the Commission deny that they ever discussed Mr. and Mrs. O'Connor's political affiliations. Mr. O'Connell claims he had not even heard of the O'Connors until he read their names in a newspaper article discussing the ACLU's plans to sue the Commission for denying its 1978 application. Two members of the Commission testified that no mention of the O'Connors was ever made at any monthly meeting of the Commission. Finally, the minutes of a July 27, 1978 meeting, at which O'Connell advised the full Commission that he would not approve the ACLU's 1978 application until the ACLU submitted a report on the use of its 1977 raffle proceeds, contains no reference to the O'Connors.

Several days after speaking with Gladstone, Zacks spoke with Connolly who said that O'Connell had denied the license because the ACLU had failed to inform the Commission as to how it had used the 1977 raffle proceeds. Connolly suggested that Zacks file a report on the use of the 1977 proceeds. Zacks did so in a letter to O'Connell, dated August 4, 1978. After requesting an explanation of the Commission's decision and a conference to discuss the matter, Zacks wrote:

> [T]he net proceeds ... were expended for the charitable purposes of the ACLU, namely maintaining, defending, and advancing civil liberties and civil rights, including the freedoms of speech, press, religion, association, and the rights to the franchise, to due process of law and to equal protection of the laws for all persons in Rhode Island and throughout the United States, by payment of a portion of the salary of the ACLU Executive Director who is the sole full-time employee of the organization.

The response to this letter was signed by Gladstone, and reaffirmed the Commission's decision to deny the ACLU's 1978 application. Gladstone offered two reasons for this action: first, the ACLU had not filed a complete financial report within 60 days of the 1977 raffle showing the use to which the profits were to be applied; second, the supplemental financial information in Zacks' August 4th letter to O'Connell revealed that proceeds were used to pay a portion of the executive director's salary. This use, he explained, was not "deemed to be a 'charitable' use" within the "precepts of the determination of charitable uses by the Rhode Island Lottery Commission." At trial, O'Connell reiterated that the reason for denying the license was that the proceeds were to be used to pay Mr. Dollinger's salary.

To support its allegation that the Commission intentionally and recklessly discriminated against it because of its members' political affiliations, the ACLU offered evidence at trial as to the Commission's treatment of applications submitted by other organizations. It contends that the applications of these other organizations were approved even though they could be criticized for the very same reasons as the rejected ACLU application. Three categories of applications were presented to the Court. Each will be considered in turn.

The first category of applications presented to the Court were either vague or silent as to how the proceeds of a proposed charitable raffle were to be used. Connolly testified that the information missing from

these applications was supplied by phoning the applicant organization and getting a verbal assurance that the proceeds would be used for charitable purposes. The defendants, however, failed to produce any records or notes to corroborate that these alleged phone calls were actually made. Nor could they recall specifically what was said by any applicant. Moreover, the ACLU demonstrated that on several occasions the Commission did not follow up on vague applications or financial reports.

For example, St. Ambrose Parish applied to hold a fund raising game of chance and stated in its application that the proceeds would be used "for benefit of the parish". Despite the possibility that "benefit of the parish" could include a priest's salary, O'Connell approved this application. Furthermore, the church's subsequent application was also approved although the financial report for the prior event was silent as to the use of proceeds and the second application stated simply that proceeds would go to "St. Ambrose Church". At trial, Connolly stated that he never inquired as to how St. Ambrose specifically planned to use the proceeds, and admitted that they could have gone to payment of salaries.

The Columban Fathers submitted an application in 1977 that said nothing about how proceeds would be used. On the application form, Connolly, after a phone call to the applicant, wrote "Columban Fathers" in the space provided for listing how proceeds would be used. Connolly admitted at trial that he did not know whether the applicant used the proceeds for salaries, and that he had not inquired. The applicant merely informed him that proceeds would go to "missionary work". O'Connell approved this application.

Another religious organization, St. Mary's Church, applied for and received approval from the Commission in 1976. Connolly wrote on the application form "church expenses" in the space for distribution of proceeds, which applicant had left blank. Connolly did not ask whether "church expenses" might include payment of salaries.

Still another example of an approved, but vague application is that of the American Kidney Fund. On its application form, the Fund stated that proceeds would go "100% to American Kidney Fund". Connolly does not know whether the organization used the proceeds to pay salaried employees, and to his knowledge, the Commission never sought additional information as to the use of such proceeds.

O'Connell also approved the vague applications of St. Kevin's Church, and of an organization known as Opportunity for Women. St. Kevins planned to use proceeds for "operation of elementary school", and Opportunity for Women intended to apply proceeds to "operational expenses". Connolly testified at trial that O'Connell approved the latter organization's application without inquiring into whether proceeds would go to salaries. Furthermore, Connolly stated that he did not call St. Kevins about the possible use of proceeds for salaries, but suggested that his secretary may have.

The second category of documentary evidence presented to the Court consists of applications and accompanying financial statements that expressly stated that proceeds would go to payment of salaries, but that the Commission nonetheless approved. As with the first group of documents, the ACLU contends that this second category indicates that the Commission did not uniformly deny applications where an organization planned to use proceeds for salaries. Defendants, however, argue that these documents are not conclusive on their face. At trial, both O'Connell and Connolly stated that, whenever an application or financial report indicated that proceeds were to go to salaries, Connolly would phone the organization involved and instruct it that payment of salaries was not a "charitable purpose". Connolly would direct the organization to apply the funds in some other charitable way. However, no notes about such conversations were presented at trial, and neither Connolly nor O'Connell can recall specifically what uses besides salaries these proceeds were diverted to.

At trial, the ACLU introduced the application of St. Casimir's Church to conduct a game of chance. This was the Church's second application to the Commission; the first was approved despite its vague statement that proceeds would "be used to defray the expenses of the Religious education program". The second application, which was initially rejected for unknown reasons, was later approved although proceeds were to be used to pay the "teaching" bill to Our Lady of Fatima High School. Despite Connolly's alleged phone call to the organization instructing it that proceeds from the latter event could not go to salaries, the Church's next application stated that proceeds would "pay teaching bill to Our Lady of Fatima". Significantly, the same person prepared both applications.

The next example that the ACLU offered is the application of St. Alexander's Church in 1978. The application was approved despite the Church's statement that proceeds would be applied to "Stipend for Instructional Services of Sisters of St. Dorothy". St. Alexander's subsequent application, also approved, was somewhat more vague: proceeds were to go to "Support of Parish Religious Educational Program". The same person filled out both applications.

Finally, the Commission granted approval to conduct an event to Our Lady of Czenstochowa Church despite an express written intention to use proceeds for salaries. After the Church held its first event in 1977, which produced a net profit of over $9,000, Reverend Narewski submitted a financial report to the Commission which stated: "all proceeds from Festival are used for the upkeep of our Parish School, especially for Teacher Salaries." Despite this statement, the Commission granted the Church's subsequent application as well. This second application stated that proceeds would go to "upkeep of school". Finally, the financial statement for this second event stated that the monies realized "as profit are used for the salaries of our lay school teachers and upkeep of parish school." Reverend Narewski prepared this second financial report.

At trial, O'Connell testified that Connolly phoned the Church after it submitted its first financial report to instruct it not to use proceeds for teachers' salaries. Furthermore, O'Connell stated that Connolly made a "big deal" about funding of salaries, and that O'Connell approved the Church's second application only after he became convinced that proceeds from the first event would not go to salaries. However, although Connolly allegedly made a "big deal" about the Church's use of proceeds, Connolly testified at trial that he could not recall making a phone call in this instance to ensure that the proceeds were not used for salaries.

The Court's own research into the documentary evidence has disclosed one instance where O'Connell denied an application where the organization had used the proceeds from a prior event for payment of salaries. In 1979, the Smithfield Boys Club applied to conduct a game of chance. The Club had conducted a similar event in 1978 and had used the proceeds to pay the salaries of swimming instructors at the Club. O'Connell denied the application, stating that "[t]he reason for this denial is that the monies were used for salaries and not for a charitable purpose."

The third category of documentary evidence presented to the Court consists of instances where the Commission approved applications despite an organization's failure to file *any* financial statement for a prior event. Connolly testified at trial that O'Connell would insist on submission of a financial report after an event only when the same organization applied to conduct a subsequent event. Furthermore, at his deposition Connolly stated that the Commission would not require a financial report after an event where an organization had conducted prior events, had filed complete reports, and had thus built a "track record" as to how proceeds would be used.

The ACLU, however, introduced evidence of numerous instances where O'Connell approved the subsequent applications of organizations that had failed to file a written financial statement for a prior event. Ap-

plications by the following organizations were approved under such circumstances: Cross Mills Fire Department Auxiliary; Palestine Temple; St. Joseph's Church; St. Patrick's High School; Our Lady of Consolation Church; Mental Health Ass'n and Assumption Church. *See* Defendants' Exhibit 20.

Finally, the ACLU seeks to rely on the testimony of Mr. O'Connell to establish that it was singled out for disparate treatment. O'Connell's testimony at his deposition and at trial clearly demonstrated that his subjective judgment controlled the issuance of licenses. He testified that he did not rely on written guidelines, never looked up the statutory definition of "charitable", and based his interpretation on "just my thinking". Although he felt that the payment of salaries was not a charitable purpose, he conceded that there were exceptions. For example, he stated that a "100% charity-type" organization could use proceeds of a game of chance for the salaries of its employees. He stated that he denied the ACLU's 1978 application because it was not such a "100% charity-type" organization and intended to use the proceeds to pay the salary of its director. Yet, he admitted that he knew nothing about the activities of the ACLU or its executive director. During his deposition he stated:

Q.: You don't think that the ACLU's activities themselves are charitable?

A.: Not all of them, no.

Q.: Which ones are not?

A.: I don't know. I don't know what activities you are referring to.

Q.: What do you know about the ACLU's activities?

A.: Not too much.

Q.: How do you know whether they are charitable or not? What do you rely on?

A.: I don't know.

O'Connell, however, was able to conclude that "in my feeling, I don't think [the ACLU] is a charity."

I. The Eleventh Amendment

■ The Commission argues that it is immune from suit in federal court under the Eleventh Amendment to the United States Constitution.[6] It is well established that the Eleventh Amendment bars not only suits where the state is a named defendant, but also suits in which the state, although not named, is the real party in interest. *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 351, 89 L.Ed. 389 (1945). The Commission claims that in reality it is an arm of the state. It argues that it "does not function with substantial autonomy from state government, is not financed independently of the state treasury and [that] any judgment against ... [it] is a judgment against the state." Defendants' Post-Trial Brief at 41. Accordingly, it concludes that it is entitled to Eleventh Amendment immunity.

■ In deciding whether an agency is an arm of the state, courts have considered a variety of factors, including: the agency's capacity to sue and be sued, the extent to which an agency has autonomy over its operations, whether the agency performs a traditional governmental function, and whether a judgment against an agency would be paid from the state treasury. *See George R. Whitten, Jr., Inc. v. State University Construction Fund*, 493 F.2d 177, 179–80 (1st Cir.1974). The First Circuit has observed that "[o]f all these factors 'ultimate State liability' is the most determinative." *Id.* at 180. In order to determine whether the Eleventh Amendment applies in this case, it is thus critical for this Court to decide whether the State of Rhode Island

6. The Eleventh Amendment provides:
The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any Foreign State.

The Eleventh Amendment includes suits against the state by its own citizens. *See Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) and cases cited therein.

would be "ultimately liable" for a judgment against the Lottery Commission.

■ Because the Eleventh Amendment was intended primarily to eliminate federal court interference with the state treasury, *Edelman v. Jordan,* 415 U.S. 651, 663–67, 94 S.Ct. 1347, 1355–57, 39 L.Ed.2d 662 (1974), it can be argued that the most important consideration in determining "ultimate state liability" is whether the damages sought would ultimately deplete the state treasury. Were this the correct test, there could be little doubt that Rhode Island would be "ultimately liable" for a judgment against the Commission. The Commission is required by statute to turn over to the state treasury all of the revenues generated by it which are not used to pay its operating expenses. R.I.G.L. § 42–61–15. Accordingly, any judgment for money damages against the Commission will reduce the amount of money it will contribute to the state, and thereby indirectly deplete the state treasury.

■ The Court does not believe, however, that the Eleventh Amendment requires that a state be considered "ultimately liable" for all money damage awards against any agency that receives or contributes money to the state treasury merely because such judgments would affect the state's fisc. *See Miller-Davis Co. v. Illinois State Toll Highway Authority,* 567 F.2d 323, 327 (7th Cir.1977) (Eleventh Amendment unavailable to state highway authority); *Matherson v. Long Island State Park Commission,* 442 F.2d 566, 568 (2d Cir.1971) (unavailable to state parkway authority); *Idaho Potato Commission v. Washington Potato Commission,* 410 F.Supp. 171, 176–77 (D.Idaho 1975) (unavailable to state agricultural commission). It is true, of course, that where the state has a continuing obligation to fund a state agency, the Eleventh Amendment bars suit against that agency in federal court because a judgment would be paid from public funds in the state treasury. *Miller-Davis Co. v. Illinois State Toll*

*Highway Authority,* 567 F.2d at 327–28 (interpreting *Fitzpatrick v. Bitzer,* 519 F.2d 559 (2d Cir.1975), *rev'd on other grounds,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). But where, as here, the state maintains no continuing obligation to fund the agency that is being sued, the Eleventh Amendment requires a more exacting analysis. In such situations determining whether the state would be "ultimately liable" for a judgment against one of its agencies depends upon a careful factual examination of the financial relationship of that body to the state and the extent to which it operates independently from the state. *See Unified School District No. 480 v. Epperson,* 583 F.2d 1118, 1121–22 (10th Cir.1978); *Hutchison v. Lake Oswego School District No. 7,* 519 F.2d 961, 966–68 (9th Cir.1975); *George R. Whitten Jr., Inc. v. State University Construction Fund,* 493 F.2d at 180–82. Only where an agency functions without meaningful fiscal and operational autonomy from the state can it partake of the state's Eleventh Amendment immunity. *See Miller-Davis Co. v. Illinois State Toll Highway Authority,* 567 F.2d at 327–28; *Morrow v. Sudler,* 502 F.Supp. 1200, 1204 (D.Col.1980); *Dyson v. Lavery,* 417 F.Supp. 103, 109 (E.D. Va.1976); *Bowen v. Hackett,* 387 F.Supp. 1212, 1221 (D.R.I.1975).

■ After close scrutiny of the facts in this case, the Court is convinced that the state would not be "ultimately liable" for a judgment against the Commission and therefore this suit is not barred by the Eleventh Amendment. Once the Commission satisfies its statutory obligations to set aside 45 percent of its revenue in a prize fund and to pay no less than 30 percent of its revenue to the state, it operates entirely free from legislative or executive interference. According to its director, it "is essentially run like a private business." It sets its own budget, has complete control over its expenditures and, finances its operational expenses entirely out of the revenue it generates. Even if the Commission declares bankruptcy, the state is under no

statutory obligation to satisfy its obligations.[7]

The fiscal autonomy of the Commission is not seriously diminished by the fact that the state treasurer has custody over the State Lottery Fund and the state controller is charged with ordering disbursements from it. The testimony at trial demonstrated that these state officials did not exercise any actual authority over the use of the Fund, but rather act on instruction from the Commission. Nor does the fact that the state auditor general is required to monitor closely the accounts of the Lottery Fund undermine the Commission's fiscal autonomy. The auditor general is charged with preventing fraud and abuse, and has no authority over daily operational expenditures.

The defendants' argument that the Commission does not function with substantial autonomy from the state and thus must be regarded as an arm of the state for purposes of the Eleventh Amendment rests primarily on *Ruman v. Commonwealth of Pennsylvania, Department of Revenue,* 462 F.Supp. 1355 (M.D.Pa.), *aff'd* 612 F.2d 574 (3rd Cir.1979), *cert. denied,* 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 823 (1980). In *Ruman,* it was held that the Pennsylvania Bureau of State Lotteries ("Bureau") was an arm of the state and therefore protected by the Eleventh Amendment. The Bureau, however, differs significantly from the Rhode Island Lottery Commission. It was created "within the Department of Revenue",

and this Department, not the Bureau itself, was given statutory authority to administer the lottery as well as the responsibility for promulgating the rules and regulations under which it was to be administered. *Id.* Moreover, if the Bureau fell short of the funds necessary to meet its statutory obligations, the shortage would be appropriated from the state treasury. *Id.* Under these circumstances, the *Ruman* Court properly concluded that "the money in the State Lottery Fund belongs to the state." *Id.*

Unlike the Bureau in *Ruman,* the Commission in this case possesses the power and resources to pay a judgment against it without prior approval from the state legislature or any other governmental officer or entity. Although a judgment against the Commission would reduce the amount of revenue it would ultimately contribute to the state treasury, such a judgment would not require the legislature to appropriate additional funds to the Commission. To deny the victims of the Commission's unconstitutional exercise of its authority recovery on Eleventh Amendment grounds would be to disregard completely the substantial autonomy that the Commission has exhibited throughout its operating history as well as the fact that the Commission generates its own revenue. This Court, therefore, holds that because the plaintiffs seek to recover from a state agency [8] that is fiscally and operationally autonomous from the State of Rhode Island, their claim is not barred by the Eleventh Amendment.[9]

---

7. There was considerable dispute in this case whether the state would satisfy the Commission's obligations in the event of bankruptcy notwithstanding that it was not obligated by statute to do so. At his deposition, O'Connell stated that there were no "agreements or understandings with state government to bail out the [C]ommission". However, O'Connell testified at trial that the Governor has assured him at a state budget meeting that Rhode Island would pay prize awards if the Commission lacked sufficient funds. Nevertheless, he was uncertain whether the state would rescue the Commission from outright bankruptcy. The fact that the state is not obligated by statute to satisfy the Commission's obligations in the event it is unable to do so, coupled with O'Connell's somewhat conflicting testimony, leads this Court to conclude that the state has not

assumed responsibility for the Commission's obligations in the event of its bankruptcy.

8. This Court's holding that the Lottery Commission is not an arm of the state and hence not protected by the Eleventh Amendment compels the conclusion that the director of the Commission, Mr. O'Connell, is also not immune from suit in his official capacity under the Eleventh Amendment.

9. The plaintiff also argues that even if the Commission was an integral part of the state, the state has waived its Eleventh Amendment immunity. It seeks to rely on this Court's decision in *Marrapese v. State of Rhode Island,* 500 F.Supp. 1207 (D.R.I.1980). The question thus becomes whether the Commission's denial of a

In short, I do not find the Commission is an alter ego of the state. Since the standard of eligibility for Eleventh Amendment immunity is more rigorous than that required for "state action", I agree with the plaintiff that its assertion that the Lottery Commission is subject to liability under 42 U.S.C. § 1983 but is not entitled to Eleventh Amendment immunity is not inconsistent. *American Civil Liberties Union of Mississippi, Inc. v. Finch,* 638 F.2d 1336, 1341–42 (5th Cir.1981).

## II. Section 1983 Liability

Before considering the merits of this case, the Court must deal with several procedural issues raised by the defendants. First, defendants argue that this Court is without jurisdiction to hear this case under 42 U.S.C. § 1983 and 28 U.S.C. § 1343 because they are not "persons" within the ambit of § 1983. Second, the defendants contend

that this case cannot be brought under § 1983 because they did not act "under color of state law". These arguments will be addressed in turn.[10]

## A. "Person" Requirement Under § 1983

■■■■ Both defendant O'Connell and the Lottery Commission argue that they are not "persons" amenable to suit under § 1983. As to defendant O'Connell, this issue is easily resolved. This Court holds that in light of the acknowledged purpose of § 1983 to provide a broad civil remedy for violations of federally protected rights, *see Owen v. City of Independence,* 445 U.S. 622, 636 n. 17, 100 S.Ct. 1398, 1408 n. 17, 63 L.Ed.2d 673 (1980), and the plain meaning of the statutory language, state officials acting in their official capacities are "persons" within the meaning of 42 U.S.C. § 1983.[11]

license to the ACLU can be considered "traditionally tortious" such that it would be "liable in ... tort in the same manner as a private individual" under R.I.G.L. § 9–31–1 (1981 Supp.) and therefore subject to money damages suits in this Court. The Court concludes that the Commission's conduct is *not* traditionally tortious. Unlike the tort of battery involved in *Marrapese,* which a private individual as well as a state policeman could commit, the denial of a license is a uniquely State act. Private persons simply do not grant or deny licenses; this has traditionally been the province of state and municipal administrative agencies. Thus, on the facts of this case, it is impossible for the Commission to be "liable in ... tort in the same manner as a private individual." There can therefore be no waiver of immunity under R.I.G.L. § 9–31–1.

Furthermore, this Court does not believe that the Rhode Island legislature would have intended its Tort Claims Act to waive sovereign immunity as to such acts. Were state and municipal licensing agencies subject to damages liability for their decisions to deny licenses, their licensing functions would be severely impaired. The fear of potential tort liability for either the agency or the agency's officials would likely have a chilling effect on discretionary decisions to deny licenses. The Rhode Island legislature clearly did not contemplate this result. *Cf. Ryan v. State of Rhode Island Department of Transportation,* 420 A.2d 841, 843 (R.I.S.Ct. 1980) (holding that individual cannot recover under Tort Claims Act for damage allegedly caused by motor vehicle registry's negligent reinstatement of driver because no duty ran to individual on the ground that "such a drastic

remedy would likely deter the registry from reinstating any drivers"); *Calhoun v. City of Providence,* 390 A.2d 350, 356 & n. 5 (R.I.S.Ct. 1978) (finding no waiver of state's sovereign immunity under Tort Claims Act where responsible official entitled to personal "discretionary function" immunity because threat of subjecting state to liability would deter official's independent decisionmaking).

**10.** Defendant O'Connell also raises the defense of failure to exhaust administrative remedies. He contends that the ACLU had a "right" to appeal his adverse decision to the full Commission, and that its failure to invoke this "right" requires the Court to dismiss the case. The simple response to O'Connell's argument is that the Supreme Court has recently unequivocally held that exhaustion of state administrative remedies is *never* a prerequisite to a federal civil rights action under § 1983. *Patsy v. Board of Regents of the State of Florida,* ——— U.S. ———, ———, 102 S.Ct. 2557, 2567, 73 L.Ed.2d 172 (1982).

**11.** Whether a suit against a State official can be maintained consistently with the Eleventh Amendment is a different question. *See Quern v. Jordan,* 440 U.S. 332, 352, 99 S.Ct. 1139, 1151, 59 L.Ed.2d 358 (1979) (Brennan, J., concurring) (separating question whether state is a "person" from question of whether suit against a state can be brought in federal court notwithstanding the Eleventh Amendment); *Marrapese v. Rhode Island,* 500 F.Supp. 1207, 1211–12 (D.R.I.1980) (same). Although some courts have allowed Eleventh Amendment con-

█ The question of whether the Lottery Commission is a "person" under § 1983 is more complicated. The starting point for this analysis is *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Monell* held that local governments are "persons" under § 1983. *Id.* at 694–96, 98 S.Ct. at 2037–39. Although the *Monell* Court expressly limited its holding to "local government units which are not considered part of the state for Eleventh Amendment purposes," *id.* at 690 n. 54, 98 S.Ct. at 2035 n. 54, its reasoning is applicable to the present case.

*Monell's* holding was based primarily upon an analysis of the legislative history of the Civil Rights Act of 1871. 17 Stat. 13 (codified at 42 U.S.C. § 1983). The Court interpreted this history as demonstrating that Congress enacted § 1983 "to provide a remedy, to be broadly construed, against *all forms of official violation* of federally protected rights." 436 U.S. at 700–01, 98 S.Ct. at 2040–41 (emphasis added). It then concluded that "since Congress intended [§ 1983] to be broadly construed, there is no reason to suppose that municipal corporations would have been excluded from [its] sweep." Id. at 686, 98 S.Ct. at 2033. This is particularly true, the Court observed, in light of the fact that the Dictionary Act, which was enacted only months before the Civil Rights Act of 1871, created a presumption that the term "person" includes "bodies politic and corporate ... unless the context shows that such words were intended in a more limited sense." Act of Feb. 25, 1871

§ 2, 16 Stat. 431. *See* 436 U.S. at 688–89, 98 S.Ct. at 2034–35.

The *Monell* Court's interpretation of the scope of § 1983 indicates that Congress intended state administrative agencies, such as the Lottery Commission, to be "persons" within the meaning of § 1983. The Dictionary Act presumption that the term "person" includes all "bodies politic and corporate" applies to state administrative agencies and there is nothing in the language or legislative history of § 1983 to rebut this presumption. Indeed, interpreting § 1983 as encompassing administrative agencies furthers the broad remedial purposes of that statute by permitting plaintiffs who allege that state agencies have violated their federally protected rights to vindicate those rights.

█ This Court's recent decision in *Marrapese v. State of Rhode Island,* 500 F.Supp. 1207 (D.R.I.1980) also supports the result reached here. In *Marrapese* it was held that "states are 'persons' potentially liable for constitutional deprivations inflicted through official custom and policy, but that, because Congress has not exercised its § 5 powers to abrogate Eleventh Amendment immunity, each state must consent to the imposition of such liability," *Id.* at 1212. Once it is accepted that Rhode Island is a "person" under § 1983, it follows that the various agencies of Rhode Island are similarly subject to suit.

**B. Under Color of State Law Requirement of § 1983**

The defendants also contend that this suit cannot be brought under § 1983 because

---

cerns to influence their construction of the scope of the word "person" in § 1983, *see, e.g. Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *Campbell v. Gadsden County District School Board,* 534 F.2d 650, 655 n. 10 (5th Cir.1976), this Court does not accept such an approach. State officials have been regarded as "persons" under § 1983 in suits for equitable relief, *see Jackson v. Sargent,* 394 F.Supp. 162, 170 (D.Mass.) *aff'd sub nom. Jackson v. Dukakis,* 526 F.2d 64 (1st Cir.1975); *Gay Students Organization of the University of New Hampshire v. Bonner,* 509 F.2d 652, 655 (1st Cir.1974), and nothing in the legislative history or language

used by Congress suggests that such officials should not be regarded as "persons" when monetary relief is sought. *Cf. City of Kenosha, Wisconsin v. Bruno,* 412 U.S. 507, 513, 93 S.Ct. 2222, 2226, 37 L.Ed.2d 109 (generic word "person" not intended to have bifurcated application to municipal corporations depending on the nature of the relief sought). Finally, the Eleventh Amendment might well bar an action for damages against a state official in his representative capacity when such a judgment would be paid from state funds, *see Edelman v. Jordan,* 415 U.S. 651, 664–71, 94 S.Ct. 1347, 1356–59, 39 L.Ed.2d 662 (1974), but this in no way suggests that a state official is not a "person" under § 1983.

they did not act "under color of state law". The "under color of state law" requirement has consistently been treated as synonymous with the state action requirement of the Fourteenth Amendment. *Rendell-Baker v. Kohn,* —— U.S. ——, ——, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982). The issue presented by this case is thus whether the actions of the Lottery Commission in denying the ACLU permission to hold a charitable raffle can be "fairly attributable to the state". *Id.*

 Although the Lottery Commission is not an arm of the state for purposes of the Eleventh Amendment, this does not mean that O'Connell's conduct was not sufficiently "official" to constitute state action. *See American Civil Liberties Union of Mississippi, Inc. v. Finch,* 638 F.2d 1336, 1341–42 (5th Cir.1981). Where, as here, the activities of a state administrative agency are circumscribed by statute and the agency's primary purpose is to generate revenue for the state, there can be little question that its activities may be attributed to the state. *See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 399, 99 S.Ct. 1171, 1176, 59 L.Ed.2d 40 (1979) (finding that actions of officers of entity that had its genesis in state law and was at time of suit still governed by state statute were taken "under color of state

law".). Accordingly, the "under color of state law" requirement is satisfied.

III. The Merits

 The ACLU contends that the defendants' actions violated its constitutional rights to freedom of speech, freedom of association, due process and equal protection under the First and Fourteenth Amendments to the United States Constitution. Since this Court finds that the defendants violated the ACLU's speech and associational rights,[12] it need not reach its due process and equal protection claims.[13]

 There can be little doubt that fund raising activities such as the charitable raffle involved in this case, implicate a variety of speech interests that are within the protection of the First Amendment. What was said in *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), in the context of door to door charitable solicitation is equally true here.

> Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or

**12.** It is well established that a corporation, such as the ACLU, has standing to assert violations of the First and Fourteenth Amendments under § 1983, both with respect to freedom of speech, *Advocates for the Arts v. Thomson,* 532 F.2d 792, 794 (1st Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976), and freedom of association, *see Gay Students Organization of the University of New Hampshire v. Bonner,* 509 F.2d 652, 654–55 (1st Cir. 1974) (injunctive relief awarded to college campus organization on the ground that its members' right to freedom of association was wrongfully denied).

**13.** Although it is not necessary to reach the ACLU's equal protection claim, the Court is persuaded as to the merits of this claim. The Equal Protection Clause demands reasonableness in both legislative and administrative classifications. *Baker v. Cincinnati Metropolitan Housing Auth.,* 490 F.Supp. 520, 529 (S.D.Ohio 1980), *aff'd* 675 F.2d 836 (6th Cir.1982). *See, Deerfield Hutterian Ass'n v. Ipswich Bd. of*

*Educ.,* 468 F.Supp. 1219, 1230 (D.S.Dak.1979); *Rehbock v. Dixon,* 458 F.Supp. 1056, 1062 (N.D.Ill.1978). Where, as here, neither fundamental rights nor suspect classes are involved a defendant's conduct passes constitutional muster if it is rationally related to a legitimate state object. *Schweiker v. Wilson,* 450 U.S. 221, 234, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1981) (legislative classification); *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 174, 101 S.Ct. 453, 458, 66 L.Ed.2d 368 (1980) (same) *Bauza v. Morales Carrion,* 578 F.2d 447, 450 (1st Cir.1978) (administrative classification). Applying this standard, this Court can see no rational reason for Commission's actions. It simply cannot reconcile Commission's approval of other applications with the denial of the plaintiff's. As pointed out in the text of this opinion, *infra,* the Commission's claim that the ACLU application was denied because the payment of salaries was not a charitable purpose cannot be accepted in light of its discriminatory treatment of that application.

for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease.

*Id.* at 632, 100 S.Ct. at 833–34.

Nor can it seriously be questioned that to deny a group a benefit—in this case permission to hold a charitable raffle—because of one of its member's political beliefs impermissibly burdens that group's ability to exist and thereby impinges on its members' associational rights. *Cf. Healy v. James,* 408 U.S. 169, 181–84, 92 S.Ct. 2338, 2346–48, 33 L.Ed.2d 266 (1972) (effect of denial of official recognition to student political organization was to abridge the associational rights of its members); *Gay Students Organization of the University of New Hampshire v. Bonner,* 509 F.2d 652 (1st Cir.1974) (denial of permission to gay students organization to hold social functions on campus abridged associational rights of its members). The fact that a group may be able to continue to exist despite the infringement on its rights is not significant. *Healy v. James,* 408 U.S. at 183, 92 S.Ct. at 2347. Associational freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Id.* Even a mere inquiry into a person's views or associations solely for the purpose of withholding a right or benefit because of what he believes violates the First Amendment. *See Baird v. State Bar of Arizona,* 401 U.S. 1, 6–7, 91 S.Ct. 702, 705–06, 27 L.Ed.2d 639 (1971).

■ From the standpoint of the First Amendment, the critical issue that must be decided in this case is whether the Commission denied the ACLU permission to hold a charitable raffle because of the alleged "Communist" affiliations of the raffle's proposed sponsor. If this was, in fact, the reason for the denial, then it is beyond dispute that the ACLU's rights to freedom of speech and freedom of association were impermissibly burdened. As the Supreme Court recognized in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Id.* at 597, 92 S.Ct. at 2697. *See also, Toward a Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation,* 417 F.Supp. 632, 637 n. 6 (D.R.I.1976).

■ After carefully reviewing the evidence in this case, the Court finds that the ACLU was denied permission to conduct a charitable raffle as a result of its members' political views. To begin with, the Court credits the testimony of Richard Zacks in its entirety. It thus finds that Mr. Gladstone, the attorney for the Commission, did ask Zacks whether Harvey O'Connor (the host for the 1977 raffle picnic) was a Communist. It also finds that Gladstone revealed to Zacks that the suspected Communist affiliation of Mr. O'Connor had "come up at the Commission", and was the real reason for denying the ACLU's application.

In reaching this conclusion, the Court is mindful of O'Connell's testimony that he had never discussed O'Connor with Gladstone and that he learned about O'Connor's identity for the first time in a newspaper article after he had denied the ACLU's 1978 application. The Court also recognizes that two Commission members testified that they never heard O'Connor discussed. Even accepting that O'Connor was not discussed by the full Commission, the Court finds that the evidence as to the arbitrary and capricious manner in which the ACLU's application was treated is so overwhelming that it inexorably leads to the conclusion that O'Connor's suspected affiliation engendered an anti-ACLU animus and that this animus was the motivating reason for the Commission's denial of its application.

The Court does not accept the Commission's justification for denying the ACLU's application; namely, that the use of the proceeds of the raffle to pay the salary of

the ACLU's executive director was not a charitable use. O'Connell's testimony demonstrated that at the time of the denial of the ACLU's application, the Commission had not established a policy that the payment of salaries was a non-charitable use. He testified both at trial and at his deposition that payment of salaries would *never* be a charitable purpose. When questioned further, however, he conceded that this seemingly absolute rule might encompass an exception for "100 percent charity-type organizations". This testimony was, in turn, contradicted by his statement that he always directed Connolly, his assistant, to phone religious organizations whenever their financial reports or applications indicated that proceeds of a raffle were being used for salaries in order to instruct them not to apply the proceeds to salaries.

The documentary evidence presented by the ACLU further suggests that the claim that the payment of salaries was not a charitable purpose was a mere pretext for the denial of the ACLU's application. The evidence shows that the Commission consistently allowed religious organizations to use the proceeds of charitable raffles for salaries, but denied other organizations this right. For example, although the ACLU and the Smithfield Boys' Club were denied licenses because salaries were paid for by event proceeds, licenses were granted to St. Casimir's Church and Our Lady of Czenstochowa Church despite their express allocation of proceeds to salaries. This Court is not persuaded that these churches were phoned and instructed not to use the proceeds for salaries. After Connolly's alleged phone calls, a subsequent application by St. Casimir's Church still stated that proceeds were to go to salaries. Similarly, after Connolly allegedly called Our Lady of Czen-

stochowa Church, the Church's financial statement for a subsequent event stated that proceeds would be applied to "salaries of our lay school teachers". It is rather strange that if these churches were phoned, each would have continued indicating that proceeds were to be used for salaries. This is especially true for Our Lady of Czenstochowa Church, which netted significant sums from its events and had good reason to be careful not to jeopardize this income.

It must be acknowledged that the telephone conversation between Zacks and Gladstone is the only evidence in the record touching directly on the First Amendment issue. Considered in isolation, the Court does not think that this conversation would necessarily prove that the ACLU was in fact denied permission to hold a charitable raffle because of its members' political beliefs. The evidence that the Commission singled out the ACLU for disparate treatment, however, is overwhelming. It proves that a subjective standard governed the determination as to whether to grant or deny an application to hold a charitable raffle. The question must be asked, "why was the ACLU's application treated differently from those of other organizations?"; the inference from the proved evidence points to Gladstone's statement. Accordingly, the Court concludes that the Commission's denial of the ACLU's 1978 application violated the ACLU's rights to freedom of speech and association under the First Amendment.

## IV. Personal Liability of O'Connell under § 1983

▇ Defendant O'Connell asserts that the doctrine of qualified immunity shields him from personal liability in this case.[14]

---

**14.** Although O'Connell failed to raise the defense of qualified immunity in his answer, at trial he moved to amend his answer to assert the defense. Citing *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), which characterized good faith immunity as an affirmative defense under Fed.R.Civ.P. 8(c), the ACLU contends that O'Connell has waived this defense. This Court disagrees and grants O'Connell's motion to amend.

The First Circuit has held that the ordinary consequence of a failure to plead an affirmative defense is its "forced waiver and exclusion from the case". *Jakobsen v. Massachusetts Port Auth.,* 520 F.2d 810, 813 (1st Cir.1975). However, the First Circuit has also stated that courts should liberally allow amendment of pleadings under Fed.R.Civ.P. 15 to permit pleading of an affirmative defense when amendment is in the interest of fairness and

The standard for determining whether officials are entitled to such immunity was recently reassessed by the Supreme Court in *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Although *Harlow* involved the qualified immunity of federal defendants from damages under an implied constitutional cause of action, the Supreme Court noted that "it would be untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Id.,* —— U.S. at —— n. 30, 102 S.Ct. at 2738–39 n. 30, citing *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978). The Court thus concludes that the standard for resolving immunity questions adopted in *Harlow* must be applied in this case.

*Harlow* significantly redefined the immunity standard laid down in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In *Wood* the Court had held that a state official is not immune from damages if he either (1) reasonably should have known that his conduct would violate basic, unquestioned constitutional rights; or (2) acted with malicious intention to deprive a person of his constitutional rights, or to cause some other injury. *Id.* at 321–22, 95 S.Ct. at 1000–01. The *Harlow* Court began its analysis by noting that the *Wood* standard has an objective element involving knowledge of and respect for "basic, unquestioned constitutional rights" and a subjective component that refers to "permissible intentions". —— U.S. at ——, 102 S.Ct. at 2737. The Court then went on to criticize the subjective component of the *Wood* test, noting that "substantial costs attend the litigation of the subjective good faith of

government officials." *Id.* at ——, 102 S.Ct. at 2738. The Court emphasized that "[j]udicial inquiry into subjective motivation ... may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government." *Id.* (footnotes deleted). Thus, the Court "[re-]defin[ed] the limits of qualified immunity *essentially in objective terms,*" holding that officials may be immune from damages "insofar as their conduct does not violate clearly established statutory or constitutional rights *of which a reasonable person would have known.*" *Id.* (emphasis added). The Court reasoned that "[i]f the law at [the] time [of an alleged violation] was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

■ Applying the objective standard adopted in *Harlow* to this case, the Court finds that O'Connell reasonably should have known that his treatment of the ACLU's application to hold a charitable raffle violated its First Amendment rights. This point need not be belabored. The denial of a benefit due to the alleged "Communist" affiliation of one of the applicant's members violates fundamental principles of the United States Constitution. It cannot be doubted that such principles, which are so very basic to the American way of life, are known and understood by the reasonable person. Accordingly, the Court holds that O'Connell is not immune from personal liability for damages under § 1983.

absent prejudice to the opponent. *Id. Accord* 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 8.27[3] at 8–251 to 8–254 (2d ed. 1982). The Court finds that amendment of O'Connell's answer would be fair and would not prejudice the ACLU. The ACLU knew months before trial that O'Connell intended to rely on the qualified immunity defense. Furthermore, the ACLU argued the *merits* of this defense in both its pre-trial memorandum and in its memorandum in opposition to defendants' motion to

dismiss. Finally, the ACLU seeks punitive damages in this suit, which require proof of aggravating circumstances such as "bad faith" and intentional violation of constitutional rights. *See Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 121 (1st Cir.1977). Such proof is also highly relevant to negating good faith immunity. In short, the Court perceives no prejudice to the ACLU and thus permits O'Connell to raise the defense of qualified immunity.

## V. Remedies

The ACLU seeks declaratory and injunctive relief as well as compensatory and punitive damages. Because the Rhode Island Legislature transferred authority over the licensing of charitable games of chance to the state police, *see* R.I.G.L. § 11–19–30.1 (1981), the ACLU's claims for declaratory and injunctive relief are now moot. The ACLU's claims for monetary relief, however, must still be considered.

### A. Compensatory Damages

In *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court adopted a general rule for the assessment of damages in a § 1983 suit. Under *Carey,* the Court must first determine whether the interest protected by the constitutional right at issue is also protected by an analogous branch of the common law. *Id.* at 258, 98 S.Ct. at 1049. If there is an analogous area, the Court must directly apply the common law principles. *Id.* If not, the Court must adapt the common law rule of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right. *Id.*

In this case, the Commission's denial of the ACLU's application to conduct a charitable raffle is not analogous to a common law tort. *See* note 9, *supra.* The Court is thus forced to adapt common law damages principles to provide fair compensation to the ACLU. Because compensatory damages are intended to restore the plaintiff to the position in which he would have been absent the defendant's wrongful conduct, the Court holds that the ACLU is entitled to recover for the natural economic consequences of the Commission's denial of its application. *See Heritage Homes of Attleboro v. Seekonk Water District,* 648 F.2d 761, 763–64 (1st Cir.), *remanded on other grounds,* 454 U.S. 808, 102 S.Ct. 81, 70 L.Ed.2d 76 (1981); *Fact Concerts, Inc. v.*

*City of Newport,* 626 F.2d 1060, 1063–64 (1st Cir.1980), *rev'd in part on other grounds,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

The ACLU contends that this Court should award it compensatory damages based on the profits it would have realized had it been permitted to conduct a charitable raffle for each of the years from 1978–1982. This Court disagrees. Having failed to even apply for permission to conduct a raffle after the denial of its 1978 application, the ACLU cannot now complain about the fact that it was denied the opportunity to conduct raffles in the years 1979–1982. Accordingly, the ACLU is entitled only to compensatory damages for the amount it would have realized from a 1978 charitable raffle.

The ACLU presented evidence that it would have realized a profit of $3,000 ($4,000 in ticket sales less $1,000 in prize money) had it been permitted to hold a charitable raffle in 1978. Accordingly, the Court concludes that the ACLU is entitled to $3,000 in compensatory damages. Because the ACLU would have had use of these proceeds for the period from 1978 to the present, the Court has decided to adjust its award to $3,500.

### B. Punitive Damages

Plaintiffs also claim that they are entitled to punitive damages as a result of the defendants' "outrageously arbitrary, discriminatory and content-based" rejection of their application to hold a charitable raffle. Plaintiff's Pretrial Memorandum at 100. This Court does not agree.[15] The test for punitive damages is a stringent one. Most courts have found that "intentional interference with constitutional rights, standing alone, is not enough; there must also be 'aggravating circumstances.'" *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 121 (1st Cir.1977). The standard used by

---

**15.** Since this Court concludes that an award of punitive damages is not appropriate in this case, it need not decide whether the Supreme Court's recent decision in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), precludes a punitive damage award against an administrative agency, such as the Lottery Commission, under § 1983.

courts to determine whether such circumstances exist has varied. *See Wade v. Haynes,* 663 F.2d 778, 785 (8th Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 1968, 72 L.Ed.2d 439 (1982). Some courts require a showing of malice or actual intent. *Morrow v. Igleburger,* 584 F.2d 767, 769 (6th Cir.1978), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1027, 59 L.Ed.2d 78 (1979); *Smith v. Losee,* 485 F.2d 334, 345 (10th Cir.1973), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974). Others require a showing of oppression, malice, gross negligence, willful or wanton misconduct or a reckless disregard for civil rights. *Guzman v. Western State Bank of Devils Lake,* 540 F.2d 948, 953 (8th Cir.1976). The First Circuit has sustained an award of punitive damages where the warrantless search of the plaintiffs' home was termed an "outrageous invasion of . . . privacy." *Caperci v. Huntoon,* 397 F.2d 799, 801 (1st Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968). Regardless of which test is relied on, the Court does not find that punitive damages are appropriate. While the question may be a close one, the Court does not think that malice or reckless disregard can be inferred from the record in this case. However reprehensively the Commission and defendant O'Connell acted, their actions fell short of the exemplary award threshold.

In accordance with the terms of this opinion, the Court orders judgment for the plaintiff in the amount of $3,500 plus attorneys' fees and costs. An order in keeping with this opinion will be prepared by the plaintiff.