NEW ENGLAND MULTI–UNIT HOUS-
ING LAUNDRY ASSOCIATION, Auto-
matic Laundry Services Co., Inc., Lun-
dermac Co., Inc., and Mac–Gray Co.,
Inc., Plaintiffs,

v.

RHODE ISLAND HOUSING AND
MORTGAGE FINANCE COR-
PORATION, Defendant.

Civ. A. No. 92–692L.

United States District Court,
D. Rhode Island.

July 27, 1995.

Kevin M. Brill, Corrente, Brill & Kusinitz, Providence, RI, for plaintiffs.

Paul M. Sanford, Steven M. Richard, Tillinghast, Collins & Graham, Providence, RI, for defendant.

## DECISION AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on the Motion for Summary Judgment filed in this action by Defendant, Rhode Island Housing and Mortgage Finance Corporation ("RIHMFC"). RIHMFC moves for summary judgment on all nine counts contained in the Complaint filed by Plaintiffs, New England Multi–Unit Housing Laundry Association ("NEMLA"); Automatic Laundry Services Co., Inc. ("Automatic"); Lundermac Co., Inc. ("Lundermac"); and Mac–Gray Co., Inc. ("Mac–Gray"). Counts I, II, III and IV of the Complaint aver claims for tortious interference with existing contracts.[1] Counts V, VI, VII and VIII set forth claims for tortious interference with prospective con-

---

1. Count I is pleaded by NEMLA. Count II is pleaded by Automatic. Count III is pleaded by Lundermac. Count IV is pleaded by Mac–Gray.

tracts.[2] Count IX alleges that RIHMFC violated Rhode Island's Administrative Procedures Act ("APA"), R.I. Gen. Laws §§ 42–35–1 to –18 (1993).[3]

## I. FACTS

The following facts are undisputed, except where noted. RIHMFC is a public corporation that loans money to real estate developers (hereinafter "owners") to finance the construction and rehabilitation of multi-unit residential real estate complexes. RIHMFC-financed developments are occupied by persons of low or moderate income who qualify for government rental subsidies pursuant to either Section 8 of the United States Housing Act of 1937 or the Rhode Island Affordable Housing Opportunity Act of 1988.

Automatic, Lundermac, and Mac–Gray (the "vendors") are laundry vendors who lease space for their coin-operated laundry machines in some of the developments financed by RIHMFC. All three vendors are Massachusetts corporations with their operations based in Massachusetts. Automatic, Lundermac, and Mac–Gray are members of NEMLA, a trade association of laundry vendors. NEMLA has never been a party to any laundry leases at any developments financed by RIHMFC. None of the plaintiffs are parties to any contracts with RIHMFC.

When an owner receives financing from RIHMFC, it must enter into a regulatory agreement ("RA") with RIHMFC. The RAs are contracts which govern the relationship between the owners as mortgagors and RIHMFC as mortgagee. Although the terms of the RAs governing different developments vary in their particulars, all RAs contain language that is similar to the following:

2. *Act and Regulations.* Mortgagor [owner] agrees that at all times its acts regarding the Development shall be in con-

formance with [RIHMFC's Enabling Act] and the rules, regulations, policies and procedures of [RIHMFC]....

....

9. *Acts Requiring [RIHMFC] Approval.* Mortgagor [owner] shall not without the prior written approval of [RIHMFC]:

....

(j) Enter into any contract or lease for supervisory, managerial or operating services....[4]

The owners also enter into Housing Management Agreements ("HMAs") with professional management agents who are responsible for the daily operation of the developments. All HMAs must be approved by RIHMFC. The HMAs governing all RIHMFC-financed developments are virtually identical. A typical HMA provides, in pertinent part:

10. *RENTALS:* The AGENT will offer for rent and will rent the dwelling units, parking spaces, commercial space and other rental facilities and concessions in the [development]. Incident thereto, the following provisions will apply:

....

j. The AGENT will negotiate commercial leases and laundry concession agreements and the AGENT, after obtaining approval of said leases and agreements by the OWNER, will forward the negotiated leases and/or agreements to RIHMFC who shall have fifteen (15) days from the date of receipt to disapprove these negotiated leases and/or agreements....

Commercial rents will not be less than the minimum from time to time approved by RIHMFC.[5]

As authorized by the HMA's, management agents and owners enter into laundry leases with the laundry vendors. Under the lease

---

2. Count V is pleaded by NEMLA. Count VI is pleaded by Automatic. Count VII is pleaded by Lundermac. Count VIII is pleaded by Mac–Gray.

3. Count IX is pleaded by all four plaintiffs.

4. RA between RIHMFC and Greenwood Terrace Associates dated October 26, 1977.

5. HMA between Greenwood Terrace Associates (the owner) and Community Housing Services, Inc. (the management agent) dated December 28, 1979, and approved by RIHMFC on January 14, 1980.

agreements, the vendors pay rent for laundry room space at the developments in which they install their coin-operated laundry machines. The amount of the rental payments is usually based on a negotiated percentage of receipts from the laundry machines.[6] Laundry leases usually ran for five or seven year terms and were renewed automatically unless the developers or management agents provided timely written notice of termination.

Pursuant to both the RAs and the HMAs, the owners and management agents were required to maintain an operating account for each development. Revenues generated by the laundry leases were deposited into the operating accounts, and the funds were then used to pay for maintenance and operations at the developments. The owners and management agents were required to submit monthly operating reports to RIHMFC. These reports summarized the accounts' activity, detailing the income and expenses at each development.

This case results from a memorandum that RIHMFC sent to the owners and management agents on October 20, 1989. RIHMFC issued the memorandum in an attempt to clarify its policies relating to the laundry leases at the developments. RIHMFC was concerned about the low levels of laundry revenue reflected in the monthly reports detailing the activity in the developments' operating accounts. It was also concerned because some owners had failed to submit laundry leases for RIHMFC's approval as required by the HMAs. Accordingly, the October 20, 1989, memorandum provided, "[E]ffective immediately, a monthly income of $3.00 per unit will be considered the minimum acceptable laundry income. If the present laundry service contracts do not meet this minimum requirement, you are instructed to negotiate new contract proposals to comply to [RIHMFC's] requirement."

RIHMFC set out additional requirements through further correspondence with the owners and management agents. The additional issues addressed included: (1) the time and method for depositing laundry revenues into the operating accounts; (2) setting a maximum term of five years for laundry leases; (3) prohibiting automatic renewals of laundry leases in order to facilitate RIHMFC's review of the leases; (4) requiring leases to include provisions relating to the vending prices; and (5) including a signature line in all laundry leases to allow RIHMFC to evidence its approval of the leases.

After RIHMFC issued the October 20, 1989, memorandum, it received communications from all three vendors complaining about the financial hardships created by the $3.00 per unit minimum. The vendors argued that although some developments generated sufficient laundry revenues to satisfy the minimum revenue requirement, at other complexes the rigid application of RIHMFC's requirements would make providing laundry services unprofitable for the vendors.[7]

On June 28, 1990, John Gordon, RIHMFC's Director of Housing Management, sent additional correspondence to all management agents and owners of RIHMFC-financed developments following-up on RIHMFC's directive of October 20, 1989. The June 1990 letter provided, in pertinent part:

> While most management agents/owners have complied to the [RIHMFC] directive, a few continue to violate the requirement of the ... memorandum. Therefore, [RIHMFC] intends to give notice to such management agents/owners that failure to comply to the ... directive dated October 20, 1989 could result in the denial of any equity distribution to the partnership.

---

**6.** A typical lease provided that the vendors would pay rent to the owner in the amount of fifty percent of gross receipts from the laundry machines.

**7.** The vendors' complaints about the "draconian" impact of the $3.00 per unit minimum are only partially borne out by the facts alleged in their responses to Defendant's interrogatories. MacGray alleges that only one property that it

serviced failed to generate the minimum revenue required by RIHMFC. Automatic alleges, on the other hand, that its leases at ten complexes failed to satisfy the minimum. Lundermac, by contrast, alleges that none of its leases generated revenues which fell short of RIHMFC's requirement. NEMLA, of course, was not a party to any leases.

According to Plaintiffs' answers to RIHMFC's interrogatories, five laundry leases were renegotiated as a result of the October 20, 1989, memorandum from RIHMFC. Mac–Gray renegotiated four leases and Automatic renegotiated one lease.[8] Lundermac states that it did not renegotiate any laundry leases. NEMLA was not a party to *any* leases, and therefore obviously did not engage in any renegotiations. In fact, in its supplementary answers to RIHMFC's interrogatories, NEMLA concedes that it suffered no damages as a result of the October 20, 1989, memorandum.

Despite the economic pressure that RIHMFC applied to the owners and management agents by threatening to withhold equity distributions, Plaintiffs do not allege either that this pressure caused the breach of any laundry service contracts or that any equity distributions were ever withheld. Besides the five renegotiations mentioned above, there is no evidence in the record that RIHMFC's directives had any other effect on any of the vendors' laundry leases. Nevertheless, Plaintiffs filed this action on December 18, 1992, seeking damages for RIHMFC's allegedly tortious conduct and requesting a declaratory judgment to the effect that RIHMFC's directives were invalid because they violated Rhode Island's APA. RIHMFC moved for summary judgment on all nine counts averred in Plaintiffs' Complaint, and the matter is now in order for decision.

## II. *DISCUSSION*

### A. Threshold Jurisdictional Issue—Is RIHMFC an Arm of the State?

■ At the outset, the Court considers two issues that raise potential jurisdictional barriers to the Court's power to adjudicate Plaintiffs' claims. First, the Court must determine whether RIHMFC, a state agency, is a "citizen" of the State of Rhode Island. Only if RIHMFC is a citizen of Rhode Is-

land, and is not the alter-ego or arm of the state, can the Court properly exercise diversity jurisdiction over this matter. Second, the Court must decide whether it is barred from adjudicating this lawsuit by the Eleventh Amendment to the United States Constitution. Although neither party raised or argued these issues, because they raise important questions about the power of this federal Court to adjudicate this matter, the Court will consider them *sua sponte*. *See* 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3524 (1984).

■ Plaintiffs allege that the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) (1993), which states, "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between ... citizens of different States."

Plaintiffs are clearly citizens of Massachusetts.[9] Although Plaintiffs contend that RIHMFC is a citizen of Rhode Island, RIHMFC's status is not so clear. RIHMFC is a "public corporation" of the State of Rhode Island, created by the Rhode Island legislature to exercise "public and essential governmental functions." R.I. Gen. Laws § 42–55–4(a) (1993). Only if RIHMFC is a citizen of Rhode Island would this case constitute an action between citizens of different states, and only then would the diversity statute confer subject matter jurisdiction on the Court.

■ It is well-established that a state is not a citizen of itself for purposes of diversity jurisdiction. *E.g., Moor v. County of Alameda*, 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973); *University of Rhode Island v. A.W. Chesterton Co.*, 2 F.3d 1200, 1202 (1st Cir.1993). A political subdivision of a state, however, is considered a citizen of

---

8. Mac-Gray alleges that it renegotiated the laundry leases for the Westcott Terrace, Aaron Briggs Manor, Etta Apartments, and Bear Hill Village complexes. Automatic claims that it renegotiated the laundry lease for the Northern Plaza development in Pawtucket.

9. Although Plaintiffs fail to allege any facts pertaining to the citizenship of NEMLA, because its constituent members are citizens of Massachusetts, for the purposes of this opinion the Court will assume that NEMLA is also a citizen of Massachusetts.

that state for diversity purposes unless it is merely the "arm or alter ego of the state." *Moor,* 411 U.S. at 717, 93 S.Ct. at 1800. If RIHMFC is an arm of the state, then it is not a citizen of Rhode Island for diversity purposes. Because Plaintiffs' claims all arise under state law, the Court would then lack subject matter jurisdiction over this lawsuit. On the other hand, if RIHMFC is not an arm of the state, then there is diversity of citizenship between the parties and jurisdiction is proper in this Court. The fundamental question the Court must consider, therefore, is whether RIHMFC is an arm of the state.

If RIHMFC is an arm of the state, then an additional jurisdictional issue arises under the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment propounds a constitutional principle of sovereign immunity that limits the authority of Article III courts. Accordingly, no statutory basis for conferring subject matter jurisdiction on an Article III court can override the immunity enjoyed by the states under the Eleventh Amendment. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984).[10]

The Eleventh Amendment bars the federal courts from exercising jurisdiction in cases where a state is sued under state law. *See Pennhurst,* 465 U.S. at 117, 104 S.Ct. at 917; *Healey v. Bendick,* 628 F.Supp. 681, 695 (D.R.I.1986). As the District Court explained in *Healey,* "The [Supreme] Court has flatly barred any intervention by a federal court to conform state officials' conduct to the rigors of a state statute on purely state law grounds." 628 F.Supp. at 695 (citing *Pennhurst,* 465 U.S. at 120–21, 104 S.Ct. at 918–19). The Eleventh Amendment not only bars the federal courts from adjudicating such actions when they are brought against the state as a named defendant, but also bars the adjudication of cases where the state is the real party in interest. *See Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.,* 991 F.2d 935, 939 (1st Cir.1993); *Vanlaarhoven v. Newman,* 564 F.Supp. 145, 147 (D.R.I.1983). Accordingly, when the defendant is a state agency, the agency enjoys Eleventh Amendment immunity only if it is an arm of the state. *Metcalf & Eddy,* 991 F.2d at 939. Therefore, this Court must decide one pivotal question: is RIHMFC an arm of the state?

If RIHMFC is an arm of the state, then two jurisdictional barriers would be raised: (1) this Court would lack subject matter jurisdiction because all of Plaintiffs' claims arise under state law, and there would be no diversity of citizenship; and (2) under the Eleventh Amendment, RIHMFC would be partially immune from suits brought in federal court for alleged violations of state law.[11] Conversely, if RIHMFC is not an arm

10. Accordingly, a federal court's exercise of diversity jurisdiction cannot override the states' Eleventh Amendment immunity. *See Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.,* 945 F.2d 10, 12 n. 4 (1st Cir.1991) *rev'd on other grounds,* — U.S. ———–——, 113 S.Ct. 684, 689, 121 L.Ed.2d 605 (1993).

11. The Eleventh amendment would only partially immunize RIHMFC. It is well-established that Eleventh Amendment immunity can be waived by the state. *See, e.g., Pride Chrysler Plymouth, Inc. v. Rhode Island Motor Vehicle Dealers' License Comm'n,* 721 F.Supp. 17, 21 (D.R.I.1989). The Rhode Island Supreme Court has held that the State of Rhode Island partially waived its Eleventh Amendment immunity from suit in federal court by enacting its Tort Claims Act, R.I. Gen. Laws § 9–31–1 (1993). *Laird v. Chrysler*

*Corp.,* 460 A.2d 425, 429 (R.I.1983). Therefore, the Eleventh Amendment presents no barrier to Counts I through VIII of Plaintiffs' Complaint, which sound in tort. On the other hand, the adjudication of Count IX, which alleges a violation of Rhode Island's APA, R.I. Gen. Laws §§ 42–35–1 to –18, would be barred by the Eleventh Amendment if RIHMFC is an arm of the state. In *Jefferson v. Moran,* the Rhode Island Supreme Court noted that under the Eleventh Amendment, the federal court lacked jurisdiction to adjudicate whether the Rhode Island Department of Corrections had promulgated certain "rules" in violation of the procedural requirements of the APA as set out in R.I. Gen. Laws 42–35–3. 479 A.2d 734, 737 (R.I.1984). The clear implication is that Rhode Island has not waived its Eleventh Amendment immunity as to claims arising under the APA. *See also Kenyon v.*

of the state, then it is a citizen of Rhode Island for diversity purposes, and the Eleventh Amendment poses no bar to the Court's adjudication of this lawsuit. The issue of whether RIHMFC is an arm of the state is a question of federal law. *See Metcalf & Eddy*, 991 F.2d at 942.

 The standards the Court must apply to determine whether RIHMFC is an arm of the state for both diversity and Eleventh Amendment purposes are virtually identical. *See A.W. Chesterton*, 2 F.3d at 1202 n. 4; *Northeast Fed. Credit Union v. Neves*, 837 F.2d 531, 534 (1st Cir.1988). Therefore, one analysis will suffice to answer both jurisdictional questions. The Court's inquiry is focused on the degree to which RIHMFC enjoys autonomy from the state. As the First Circuit Court of Appeals noted in *Metcalf & Eddy*, "[T]he more tightly the agency and the state are entangled, the more probable it becomes that the agency shares the state's Eleventh Amendment immunity." 991 F.2d at 940. The Court's analysis is "an essentially functional inquiry, not easily amenable to bright-line answers or mechanical solutions." *Id.* at 939. However, in *Metcalf & Eddy*, the First Circuit outlined a seven-part test that is not exhaustive, but guides the Court in determining whether a state agency is an arm of the state, or whether it is an autonomous entity. *Id.* at 939–40. The seven areas of inquiry are: (1) does the agency have the funding power to satisfy judgments without direct state participation or guarantees?;[12] (2) is the agency's function governmental or proprietary?; (3) is the agency separately incorporated?; (4) does the state retain control over the agency, and to what extent?; (5) does the agency have the power to sue, be sued, and enter into contracts in its own name and right?; (6) is

the agency's property subject to state taxation?; and (7) has the state immunized itself from responsibility for the agency's acts or omissions? *Id.* These factors, taken together, illustrate that a state agency is an arm of the state "only where [it] functions without meaningful fiscal and operational autonomy from the state...." *Rhode Island Affiliate, American Civil Liberties Union, Inc. v. Rhode Island Lottery Comm'n*, 553 F.Supp. 752, 764 (D.R.I.1982). After examining RIHMFC's enabling legislation, R.I. Gen. Laws §§ 42–55–1 to –29 (1993), the Court concludes that RIHMFC functions as a sufficiently autonomous entity that it is not an arm of the state for either diversity or Eleventh Amendment purposes.[13]

 The characteristics of RIHMFC that are pertinent to this inquiry are readily discernable from its enabling · legislation. RIHMFC is "a public corporation of the state, having a distinct legal existence from the state and not constituting a department of the state government...." R.I. Gen. Laws § 42–55–4(a). RIHMFC's status as a public corporation is an important factor that supports the conclusion that it is an autonomous entity, but is not dispositive for either Eleventh Amendment or diversity purposes. *See A.W. Chesterton*, 2 F.3d at 1204. Further, RIHMFC is "a public instrumentality exercising public and essential governmental functions." R.I. Gen. Laws § 42–55–4(a). The First Circuit has observed that, "[T]he State's delegation of essential governmental functions, together with the power to generate and control the nonappropriated revenues with which to perform those governmental functions, normally will be viewed as supporting, rather than undermining, the entity's independent status...." *A.W. Chesterton*, 2 F.3d at 1206 n. 9.

*Sullivan*, 761 F.Supp. 951, 958 (D.R.I.1991) (state has not waived Eleventh Amendment immunity as to suits involving traditional governmental activities); *Healey*, 628 F.Supp. at 695 ("Rhode Island has not forfeited [Eleventh Amendment] protection with respect to the discretionary administrative acts and omissions of the state's departments, commissions, [or] boards....").

**12.** Although the Court must weigh all these factors, the most determinative consideration is

whether the state has the legal obligation to satisfy a judgment against the agency from the public coffers. *See Metcalf & Eddy*, 991 F.2d at 939; *Rhode Island Affiliate, American Civil Liberties Union, Inc. v. Rhode Island Lottery Comm'n*, 553 F.Supp. 752, 763–64 (D.R.I.1982).

**13.** The facts contained in an agency's enabling statute constitute a sufficient basis for a court's determination of whether, as a matter of law, a state agency is an arm of the state or an autonomous entity. *See A.W. Chesterton*, 2 F.3d at 1213.

RIHMFC is run by seven Commissioners who are appointed by the Governor of Rhode Island with the advice and consent of the State Senate to serve staggered, four-year terms. R.I. Gen. Laws § 42–55–4(b). A Commissioner can be removed from office by the Governor for "misfeasance, malfeasance, or willful neglect of duty." R.I. Gen. Laws § 42–55–4(b). RIHMFC's Commissioners receive no compensation for their services, but are reimbursed for reasonable expenses incurred in performing their duties. R.I. Gen. Laws § 42–55–4(d). On balance, although the state may be able to exercise some influence over RIHMFC's operations through the power of appointment, the fact that Commissioners are unpaid, serve staggered terms, and do not serve at the pleasure of the Governor, suggests that RIHMFC retains significant operational autonomy from the state. *See A.W. Chesterton*, 2 F.3d at 1207–08 (although board of education was at risk of subtle manipulation by the state via exercise of power of appointment, it was insulated by staggered terms of members, who could only be removed for cause).

A number of RIHMFC's statutorily granted powers indicate that it is an autonomous entity, rather than an arm of the state. RIHMFC has the power to sue and be sued in its own name. R.I. Gen. Laws § 42–55–5(1). It may enter into contracts. R.I. Gen. Laws § 42–55–5(6). RIHMFC may acquire and dispose of real or personal property in its own name. R.I. Gen. Laws § 42–55–5(7). It can enter into agreements and contracts with other governmental entities, both federal and state, R.I. Gen. Laws 42–55–5(8),(9). RIHMFC has the power to invest its surplus monies pursuant to R.I. Gen. Laws § 42–55–5(15), and to borrow money and issue bonds and notes or other evidences of indebtedness under R.I. Gen. Laws § 42–55–5(21). RIHMFC can also form subsidiary corporations if doing so is useful to RIHMFC's efforts to fulfill its statutory purposes. R.I. Gen. Laws § 42–55–5.1(a).

In addition, RIHMFC has the power to make mortgage loans. R.I. Gen. Laws § 42–55–6(a), and to make grants to assist in the construction, rehabilitation, or operation of residential housing. R.I. Gen. Laws § 42–55–6(h). RIHMFC can acquire and operate housing projects. R.I. Gen. Laws § 42–55–7.1. As needed, RIHMFC can issue its own negotiable bonds and notes to raise capital needed to achieve its corporate purpose. R.I. Gen. Laws § 42–55–13. This is particularly significant because, as the First Circuit explained in *Metcalf & Eddy*, "The power and opportunity to generate a revenue stream and thereby finance an agency's operations is an important attribute of the agency's separate identity." 991 F.2d at 942. Significantly, the enabling legislation provides:

> Obligations issued under the provisions of this chapter shall not be deemed to constitute a debt or liability or obligation of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any political subdivision but shall be payable solely from the revenues or assets of the corporation.

R.I.Gen.Laws § 42–55–19. The fact that, in the event RIHMFC defaults on its obligations, bondholders and creditors can only look to RIHMFC for redress, is especially important to the Court's conclusion that RIHMFC is not an arm of the state. *See Moor*, 411 U.S. at 720, 93 S.Ct. at 1801 (county was not an arm of the state where the state had no obligation to honor county's bonds); *Metcalf & Eddy*, 991 F.2d at 942 (agency was not an arm of the state where bondholders could look only to the agency in the event of default).

Some factors do tend to support the position that RIHMFC is an arm of the state. One factor is that RIHMFC is exempt from paying state income or property taxes. R.I. Gen. Laws § 42–55–24. *See Metcalf & Eddy*, 991 F.2d at 940. Tax exemptions, however, have been held to be only minimally probative of an agency's status as an arm of the state. *See A.W. Chesterton*, 2 F.3d at 1209. Another factor is that RIHMFC must comply with Rhode Island's APA. *See A.W. Chesterton*, 2 F.3d at 1208 (autonomous state university was expressly exempted from compliance with APA). RIHMFC is expressly included among the agencies that must adhere to the APA. R.I. Gen. Laws

§ 42–35–1(a), (b). These factors do not, however, outweigh those which support the conclusion that RIHMFC is an autonomous entity.

On balance, the Court is satisfied that RIHMFC is an autonomous entity and is not an arm of the state for either diversity or Eleventh Amendment purposes. RIHMFC enjoys significant operational and financial autonomy, and it is therefore clear that RIHMFC, and not the State of Rhode Island, is the real party in interest in this matter. Accordingly, the Court may properly exercise diversity jurisdiction over this lawsuit, and the Eleventh Amendment poses no constitutional barrier to further adjudication of this matter in federal court.

## B. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for a court ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary judgment is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the non-moving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Additionally, the moving party bears the burden of showing that there is insufficient evidence in the record to support the non-moving party's position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that showing is made, the motion can then be granted if, as a matter of law, the moving party is entitled to judgment in its favor.

## C. Applicable Law

The Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1). Because the basis for the Court's jurisdiction is the diversity of citizenship of the parties, the Court must apply the substantive law of the state where it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). In this case, extensive choice of law analysis is unnecessary because the parties do not dispute that Rhode Island law governs Plaintiffs' claims. Therefore, the Court will be applying the law of Rhode Island when considering RIHMFC's Motion for Summary Judgment.

## D. Standing

At the outset, the Court considers RIHMFC's argument that Plaintiffs lack standing to raise their claims before this Court. The Court declines Defendant's invitation to decide the thorny issue of whether Plaintiffs have standing to sue. As the subsequent analysis illustrates, Plaintiffs' claims as averred in Counts I through VIII must fail on their merits, and the Court abstains from adjudicating Count IX. Consequently, Defendant's standing arguments are not necessary to the Court's decision in this case.[14]

## E. Tortious Interference with Contract

Counts I, II, III and IV seek damages for RIHMFC's alleged interference with the laundry leases that were in effect when RIHMFC directed the owners to renegotiate. Under Rhode Island law, "intentional and malicious interference with a contractual relationship is actionable." *Smith Dev. Corp. v. Bilow Enters., Inc.*, 112 R.I. 203, 308 A.2d 477, 480 (1973) (citing *Local Dairymen's Coop. Ass'n v. Potvin*, 54 R.I. 430, 173 A. 535 (1934)). In this context, malice is defined as unjustified interference, and does not require a showing of spite or ill-will.

14. A court may avoid complex questions of standing where the case can be readily disposed of on the merits. *See Chinese Am. Civic Council v. Attorney General*, 566 F.2d 321, 325 & n. 9 (D.C.Cir.1977); 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.15 (1984).

*Smith,* 308 A.2d at 480. As the Rhode Island Supreme Court noted in *Jolicoeur Furniture Co., Inc. v. Baldelli,* "If [the] interference is found to be intentional and without justification, it is malicious in law even though it arose from good motives and without express malice." 653 A.2d 740, 753 (R.I.1995) (quoting *Steranko v. Inforex, Inc.,* 5 Mass.App. 253, 362 N.E.2d 222, 235 (1977)).

The elements of the tort of interference with a contractual relationship are well-established under Rhode Island law. To prevail under this theory, a plaintiff must prove: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional interference with the contract, and (4) that plaintiff suffered damages as a result of defendant's interference. *Banco Totta e Acores v. Fleet Nat'l Bank,* 768 F.Supp. 943, 950 (D.R.I.1991) (citing *Smith,* 308 A.2d at 482). When the plaintiff establishes these four elements, the burden then shifts to the defendant to demonstrate a justification for the interference. *See Smith,* 308 A.2d at 482. Even where the defendant asserts that it was merely exercising its own contractual rights, its actions, if found to be unreasonable, can constitute improper interference with the plaintiff's contractual relationship. *Thompson Trading, Ltd. v. Allied Breweries Overseas Trading Ltd.,* 748 F.Supp. 936, 943, 945 (D.R.I.1990) (where defendant had contractual right to approve or disapprove an assignment, unreasonably withholding consent could constitute tortious interference).

The paradigmatic case of tortious interference with contract arises when a defendant induces the breach of a contractual relationship between the plaintiff and a third party. However, the interference need not result in a breach for the defendant's conduct to be tortious. Substantial interference with performance, that is, any act which retards, makes more difficult, or prevents performance, or makes performance less valuable, may also constitute tortious interference. *Smith,* 308 A.2d at 482. *See also Restatement (Second) of Torts,* § 766 cmt. k (1979); W. Page Keeton et. al., *Prosser and Keeton on the Law of Torts* § 129, at 991 (5th ed. 1984). In this case, however, neither the vendors nor NEMLA can prevail on their claims of tortious interference with contract.

### 1. The Vendors' Claims

It is plain that the vendors were party to contracts (the laundry leases) with each owner or management agent of the developments where they provided laundry services. The first element of the *Smith* test is therefore satisfied. It is equally clear that RIHMFC must have known that these contracts existed. Under both the RAs and HMAs, the owners and management agents were required to submit all laundry leases to RIHMFC for its review and approval. Also, RIHMFC's memorandum of October 20, 1989, pertained specifically to the laundry leases then in effect between the owners or management agents and the laundry vendors. Accordingly, there is no question that RIHMFC had knowledge of the laundry leases.

It is the third element of the *Smith* test, however, that presents an insurmountable obstacle to the vendors' claims that RIHMFC intentionally interfered with their contracts. The vendors' claims must fail as a matter of law because RIHMFC did not interfere with the laundry leases. It is undisputed that in its memorandum of October 20, 1989, RIHMFC instructed the management agents and owners to renegotiate any laundry leases that failed to generate the minimum monthly income requirement of $3.00 per unit. It is also undisputed that in RIHMFC's June 28, 1990, memorandum to the management agents and owners, Gordon warned that failure to comply with the October 20, 1989, directive could result in RIHMFC withholding equity distributions from the owners. These undisputed facts do not, however, establish that RIHMFC intentionally interfered with Plaintiffs' contractual relationships.

RIHMFC clearly exerted economic pressure in an effort to induce the management agents and owners to renegotiate their laundry leases with the vendors. Accordingly, the owners and management agents were compelled to attempt to renegotiate the leases to conform to RIHMFC's requirements. However, RIHMFC's directive did not ad-

versely affect the vendors' contractual rights. The vendors were not compelled by RIHMFC's directive to renegotiate *any* laundry leases. Two vendors, Mac–Gray and Automatic, each allege that they renegotiated laundry leases as a result of RIHMFC's memorandum. Even assuming that these leases were in fact renegotiated by Mac–Gray and Automatic, such renegotiations were voluntary actions on the part of the vendors, and were not compelled by RIHMFC. All three vendors were parties to valid and enforceable laundry leases, and as such they were free to stand firm on their contractual rights and refuse to renegotiate the leases. The fact that they elected to renegotiate does not render RIHMFC liable.

RIHMFC clearly did not instruct the owners and management agents to breach their leases with the vendors in the event that the vendors refused to renegotiate. Had RIHMFC done so, its actions may well have constituted tortious interference with Plaintiff's contractual relationships. In this case, however, Plaintiffs' have alleged no facts to demonstrate that any leases were breached as a result of RIHMFC's directives. RIHMFC merely instructed the owners and management agents to attempt to renegotiate their leases with the vendors. Accordingly, the vendors have failed to allege facts that demonstrate that RIHMFC intentionally interfered with their laundry leases. Therefore, their claims that RIHMFC tortiously interfered with their contractual relationships must fail as a matter of law.

### 2. NEMLA's Claim

■ NEMLA's claim that RIHMFC tortiously interfered with its contractual relationships fails on two grounds. First, NEMLA does not allege that it was a party to any laundry leases, or any other contracts for that matter. Secondly, in NEMLA's Supplementary Answers to Defendant's Interrogatories, NEMLA admits that it suffered no damages as a result of RIHMFC's actions. Accordingly, NEMLA clearly fails to meet *any* of the elements of the *Smith* test. Therefore, NEMLA's claim that RIHMFC tortiously interfered with its contractual rela-

tionships is spurious as a matter of law and deserves no further discussion.

### F. Tortious Interference with Prospective Contracts—The Vendors' and NEMLA's Claims

■ The Rhode Island Supreme Court first recognized the tort of intentional interference with prospective contractual relations in *Federal Auto Body Works, Inc. v. Aetna Cas. & Sur. Co.*, 447 A.2d 377, 379–80 (R.I.1982). Under Rhode Island law, the elements of this tort are nearly identical to those for tortious interference with an existing contract. The plaintiff must establish: (1) the existence of a business relationship or expectancy; (2) that the defendant had knowledge of that relationship or expectancy; (3) an intentional act of interference by the defendant; (4) that the act of interference caused harm sustained by the plaintiff; and (5) that the plaintiff suffered damages. *Mesolella v. City of Providence*, 508 A.2d 661, 669 (R.I.1986). The plaintiff must prove that the defendant acted with legal malice, that is, the intent to do harm without justification. *Id.* at 670. The burden then falls upon the defendant to demonstrate a justification for its actions. *Id.*

■ Again, as a matter of law, Plaintiffs' claims fall far short of the mark. Indeed, Plaintiffs allege virtually no facts to satisfy any of the elements of the tort. Even viewed in the light most favorable to Plaintiffs, there is no evidence in the record to prove that Plaintiffs had pending or prospective business relationships that had not yet been consummated by executed laundry leases. There is no evidence that RIHMFC had knowledge of any such prospective relationships. Accordingly, Plaintiffs cannot prove either that RIHMFC interfered with any prospective contractual relationships, or that they suffered any damages caused by such interference. In short, Plaintiffs' allegations of prospective injuries suffered as a result of RIHMFC's alleged tortious interference are, putting it charitably, speculative.

■ RIHMFC has directed the owners and their management agents to include certain provisions in all future laundry leases. Compliance with these requirements will cer-

tainly be a factor in future lease negotiations between the vendors and the owners of the developments or their management agents. The mere fact that RIHMFC has imposed new conditions on its mortgagors, however, certainly does not rise to the level of tortious interference with Plaintiffs' prospective contractual relations. As a matter of law, the claims of both the vendors and NEMLA that RIHMFC tortiously interfered with their prospective contractual relationships are completely without merit.

### G. Administrative Procedures Act—Court Abstains From Adjudicating

 The Court abstains from adjudicating the merits of Count IX under the administrative abstention doctrine recognized by the United States Supreme Court in *Burford v. Sun Oil Co.,* 319 U.S. 315, 332, 63 S.Ct. 1098, 1106, 87 L.Ed. 1424 (1943). As the Supreme Court has observed, "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). However, in limited circumstances, a federal district court has the discretion, even where jurisdiction is otherwise proper, to refuse to exercise its power and instead leave the legal claims of the parties for resolution by the state courts. *See Bath Memorial Hosp. v. Maine Health Care Fin. Comm'n,* 853 F.2d 1007, 1012 (1st Cir.1988). Considerations of federal-state comity and judicial economy underlie a court's decision to abstain.

In *Burford,* the United States Supreme Court recognized a ground for abstention that is applicable in this case. The First Circuit has held that *Burford* abstention, as the doctrine is widely termed, is permissible where the exercise of a federal court's equitable power threatens to place an unnecessary and significant burden on the ongoing administration of a state's regulatory system.

*Bath Memorial Hosp.,* 853 F.2d at 1013. In other words, *Burford* abstention is applicable where "the federal court might, in the context of the state regulatory scheme, create a parallel, additional, federal, 'regulatory review' mechanism, the existence of which would significantly increase the difficulty of administering the state regulatory scheme." *Bath Memorial Hosp.,* 853 F.2d at 1013.

 This doctrine is grounded in principles of comity—that in some cases federal courts should exercise their discretion and restrain their authority out of "scrupulous regard for the rightful independence of the state governments." *Burford,* 319 U.S. at 332, 63 S.Ct. at 1107 (quoting *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941)). Upon analysis of Plaintiffs' claim in Count IX, which alleges that RIHMFC's memorandum of October 20, 1989, violated Rhode Island's APA, it is clear that the Court should abstain from adjudicating this matter.

 Plaintiffs' contention that RIHMFC violated the APA rests entirely on state law grounds. No federal interest is implicated by Plaintiffs' allegations. Although the allegations contained in Count IX are conclusory, at best, and receive virtually no elaboration in Plaintiffs' memorandum, the thrust of Plaintiffs' APA claim is clear. Plaintiffs request this Court to issue a declaratory judgment holding that: (1) RIHMFC's memorandum of October 20, 1989, and its subsequent communications with the owners and management agents, constituted "rules" as defined by R.I. Gen. Laws § 42–35–1(h); (2) that those "rules" were not adopted in conformance with the APA's procedural requirements as set out in R.I. Gen. Laws § 42–35–3; and (3) that because those "rules" were adopted by means of a defective process, they are invalid and therefore inapplicable to the laundry leases which Plaintiffs have entered into at the developments.[15]

---

**15.** Without deciding this issue, this Court observes that it is unlikely that the Rhode Island Supreme Court would consider RIHMFC's actions to constitute rulemaking. As distinct from promulgating an administrative rule of "general applicability that implements, interprets, or prescribes law or policy or describes the organization, procedure, or practice requirements of [RIHMFC]," as "rule" is defined by R.I. Gen. Laws § 42–351(h), this Court believes that RIHMFC, through its memorandum of October 20, 1989, was simply exercising the contractual rights afforded to it as the mortgagee under the RAs executed by RIHMFC and the owners, and

Count IX relies entirely on state law. The Rhode Island Supreme Court has never interpreted the scope of the term "rule" as defined by the APA, R.I. Gen. Laws § 42-35–1(h). This Court is not tempted by Plaintiffs' invitation to define that term and determine the APA's applicability to this case. The APA provides for judicial review of the validity and applicability of rules promulgated by administrative agencies through an action for declaratory judgement brought in the Superior Court for Providence County. R.I. Gen. Laws § 42–35–7. If this Court were to issue a declaratory judgment interpreting the APA's applicability to this case, in effect it would be establishing an avenue of judicial review parallel to that expressly established by the Rhode Island legislature when it enacted the APA. Such a result would clearly interfere with Rhode Island's efforts to maintain a uniform system for the review of administrative rules promulgated by state agencies. *Cf. Stephens v. Cooper,* 746 F.Supp. 292, 296 (E.D.N.Y.1990) (court abstained under *Burford* where plaintiff contested whether fee schedule was promulgated in compliance with state administrative procedures); *St. Tammany Parish Hosp. Serv. Dist. v. Department of Health and Human Resources,* 677 F.Supp. 455, 462–63 (E.D.La.1988) (court abstained under *Burford* from issuing declaratory judgment regarding whether state agency promulgated rule in violation of state APA). For this reason, the Court abstains from adjudicating Count IX, and dismisses Count IX without prejudice. If Plaintiffs wish to pursue their APA claims, they may do so in state court as provided by statute.

### III. *CONCLUSION*

For the foregoing reasons, the Court concludes that with respect to Counts I through VIII, there are no genuine issues of material fact that require resolution through trial and Defendant is entitled, as a matter of law, to summary judgment in its favor. As to Count IX, the Court abstains from adjudicating this claim under the principles enunciated in *Burford.* Count IX is, therefore, dismissed with-

the HMAs executed by the owners and management agents subject to RIHMFC's approval. The APA would most likely be inapplicable to such an

out prejudice. The Clerk will enter judgment for defendant, as indicated, forthwith.

*It is so ordered.*

exercise of RIHMFC's contractual rights as a mortgagee.