# United States Court of Appeals
## For the First Circuit

No. 13-1722

RICHARD BISBANO, SR.,

Plaintiff, Appellant,

v.

STRINE PRINTING CO., INC., AND MICHAEL STRINE, SR.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Howard, Selya and Stahl,

Circuit Judges.

V. Edward Formisano and Formisano & Company on brief for appellant.
Jeffrey S. Brenner, Steven M. Richard, and Nixon Peabody LLP on brief for appellees.

November 27, 2013

**SELYA, <u>Circuit Judge</u>.** The practice of giving gifts as a means of securing favors is as old as the hills. In ancient Greece, for example, legend has it that Zeus asked Paris, a Trojan prince, to decide which of three goddesses was the fairest of them all. Paris chose Aphrodite, rejecting proffered bribes of kingly power from Hera and military might from Athena. But Aphrodite too had tendered a bribe, agreeing to help him win the hand of the most beautiful woman alive.

A modern-day commercial equivalent of this practice is the giving of a gratuity to a procurement officer, behind her employer's back, for the purpose of steering a contract to the donor. But sales techniques of this sort are by their nature clandestine; they cannot withstand the sunlight. If the employer learns about the kickback, the consequences are usually unpleasant. This case, in which defendants Michael Strine and his eponymous firm, Strine Printing Company (SPC), first hired and later fired the plaintiff, Richard Bisbano, turns on such a revelation.

When he was cashiered, the plaintiff did not go quietly into obscurity but, rather, brought suit for an oleaginous mass of perceived wrongs, including unjust enrichment, tortious interference with prospective contractual relations, breach of contract, breach of an implied covenant of good faith and fair dealing, and misrepresentation. The district court, deftly sorting wheat from chaff, granted summary judgment in favor of the

defendants.  See Bisbano v. Strine Printing Co., No. 10-358, 2013 WL 1907455, at *12 (D.R.I. May 8, 2013).  After careful consideration, we affirm.

## I.  BACKGROUND

We assume the reader's familiarity with the district court's factual account and, thus, start by tracing the genesis of this appeal.  To the extent that we discuss the facts, we take them (and the reasonable inferences therefrom) in the light most hospitable to the summary judgment loser (here, the plaintiff). See Griggs-Ryan v. Smith, 904 F.2d 112, 114 (1st Cir. 1990).

The plaintiff is a veteran sales representative who specializes in the sale of commercial printing services.  For nearly two decades, CVS (a powerhouse firm that owns and operates thousands of drug stores) was a significant source of business for him.  Over the years, he carried that client with him from Winthrop Printing Company to Allied Printing Services (Allied) and, eventually, to SPC.  During most of this odyssey, the plaintiff used a broker, Vanco, as an intermediary to assist him in securing CVS's business.

When the plaintiff shifted his allegiance to SPC in December of 2006, he also took with him a secret.  While working for Allied, he had surreptiously helped to pay the car lease of a CVS printing department employee.

-3-

Allied was not happy about the plaintiff's departure and his ensuing solicitation of CVS on his new employer's behalf. It sued both the plaintiff and SPC, and these suits complicated the parties' tug-of-war over CVS's patronage.

To complicate matters further, the suits apparently spooked Vanco. As a result, the broker began to steer what CVS business it could influence to other printers. On learning of Vanco's perfidy, the plaintiff and SPC decided to forge a direct relationship with CVS and, in mid-2007, cut all ties with Vanco.

The plaintiff's 2008 commissions dropped precipitously, reflecting this parting of the ways. By the following year, however, his commissions had rebounded to their 2007 level. They continued to rise during the first half of 2010.

This story might have had a happy ending but for the plaintiff's earlier indiscretion. In the course of an internal review of its printing procurement practices, CVS learned of the plaintiff's role, while at Allied, in the apparent kickback.

In April of 2010, the plaintiff confessed his complicity to CVS executives. Shortly afterward, CVS's vice president for strategic procurement decided that the company would not do business with the plaintiff and that SPC would need to remove him from the CVS account. Although the plaintiff contests whether this decision was contemporaneously communicated to the defendants, it

is undisputed that CVS made the decision and that, at the end of June, SPC dismissed the plaintiff.

The plaintiff repaired to a Rhode Island state court, pressing a welter of contract, quasi-contract, and tort claims against the defendants. Citing diversity of citizenship and the existence of a controversy in the requisite amount, the defendants removed the action to federal court. See 28 U.S.C. §§ 1332(a), 1441.

We fast-forward to the close of discovery. At that point, the defendants moved for summary judgment. See Fed. R. Civ. P. 56. Over the plaintiff's objection, the district court granted the motion. See Bisbano, 2013 WL 1907455, at *12. This timely appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

## II. ANALYSIS

Because this is a diversity case that has its center of gravity in Rhode Island, that state's substantive law supplies the rules of decision. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994). We review the district court's entry of summary judgment de novo. See Jones v. Secord, 684 F.3d 1, 5 (1st Cir. 2012).

### A. Unjust Enrichment.

The plaintiff's unjust enrichment claim is the logical starting point. In Rhode Island, a plaintiff who seeks to recover for unjust enrichment must prove that he conferred a benefit on the

defendant; that the defendant knew of the benefit and appreciated it; and that it would be unfair for the defendant to retain the benefit without paying for it. See Multi-State Restoration, Inc. v. DWS Props., LLC, 61 A.3d 414, 418-19 (R.I. 2013); R & B Elec. Co. v. Amco Constr. Co., 471 A.2d 1351, 1355-56 (R.I. 1984).

The plaintiff identifies three benefits that he claims to have conferred on the defendants: he "brought the CVS print work to [SPC];" "secured additional printing work from CVS during his employment;" and "obtained 'preferred vendor status' for [SPC]."[1] We can make short shrift of the first two "benefit" claims. It is uncontroverted that the plaintiff received commissions for the CVS business that he generated while with SPC. Where, as here, a plaintiff is fully compensated for a benefit conferred, a claim for unjust enrichment will not lie. See Narragansett Elec. Co. v. Carbone, 898 A.2d 87, 99 (R.I. 2006) (explaining, with respect to unjust enrichment, that "a benefit is conferred when . . . services are rendered without payment" (emphasis supplied)).

At first blush, the plaintiff's claim with respect to preferred vendor status looks more promising. He argues that SPC attained this status through his efforts and, as a result, was put "in a position to receive a substantial share of CVS's printing

---

[1] In enumerating the benefits that he ostensibly conferred on SPC, the plaintiff also mentions the work that he did with CVS prior to his recruitment by SPC. This earlier work cannot conceivably constitute an independent benefit conferred on SPC.

work." Generously construed, the plaintiff's argument is that his anticipated remuneration for these efforts was to be the opportunity to pursue <u>future</u> commission-generating sales to CVS. Having been denied that opportunity by reason of his ouster, he seeks to recover its value.

This argument is incompatible with the evidence. The record makes manifest that preferred vendor status is simply a pre-qualification that clears the way for a supplier to bid on CVS's emerging print orders. So viewed, the plaintiff's efforts to help SPC achieve preferred vendor status were part and parcel of his normal sales activities — work for which he was fully compensated.

The plaintiff's own characterization of his efforts supports this conclusion. When asked in an interrogatory to describe what he had done to obtain preferred vendor status for CVS, he responded:

> I provided CVS with the highest level and quality of service. I filtered errors and printing mistakes [SPC] made. I had several meetings with CVS to ensure that the company was satisfied and that its printing needs were being met. I also provided valuable information on how best to handle various projects. I also sought additional printing opportunities for [SPC] from different departments at CVS.

These labors are precisely those that one would expect a sales representative to undertake in the ordinary course of his duties.

The decision in <u>Arrison</u> v. <u>Information Resources, Inc.</u>, No. 95-3554, 1999 WL 551232 (N.D. Cal. July 16, 1999), much bruited

-7-

by the plaintiff, turns out to be a dead end.  There, the plaintiff's employer asked him to pursue a sales arrangement that was outside the customary scope of his work.  See id. at *3.  As a result, the plaintiff spent a year courting a prospective client.  See id.  When he was on the verge of closing the deal, the rug was pulled out from under him: the prospective client purchased his employer outright, thus rendering the sales arrangement moot and depriving the plaintiff of his anticipated commission.  See id.

On these idiosyncratic facts, the court found that "but for" the acquisition of the company, the plaintiff would have completed the product sale.  Id. at *6.  Relatedly, the court found that the plaintiff's "efforts were a significant factor that contributed to the . . . acquisition."  Id. at *7.  Thus, he was entitled to recover the reasonable value of his efforts on a theory of quantum meruit.[2]  See id. at *7-9.

This case is a horse of a much different hue.  The record contains nothing to indicate that SPC asked the plaintiff to perform additional, uncompensated services related to the CVS account — nor does the plaintiff offer any evidence that he did so.  The holding in Arrison is, therefore, inapposite.

---

[2] Quantum meruit is a species of unjust enrichment.  See ConFold Pac., Inc. v. Polaris Indus., Inc., 433 F.3d 952, 957-58 (7th Cir. 2006).  For present purposes, we need not draw fine distinctions among the various branches of the doctrine of unjust enrichment.

-8-

## B. Intentional Interference.

We turn next to the plaintiff's claim of intentional interference with prospective contractual relations. In order to recover on such a claim, Rhode Island requires a plaintiff to prove: "(1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff." L.A. Ray Realty v. Town Council of Cumberland, 698 A.2d 202, 207 (R.I. 1997). There is, moreover, a sixth requirement: the act of interference must be "improper." Avilla v. Newport Grand Jai Alai LLC, 935 A.2d 91, 98 (R.I. 2007).

We are skeptical that the plaintiff's claim satisfies any of these elements, but we need not go beyond the first. The plaintiff insists that the district court erred in holding that because he did not have a bilateral contract with CVS, he did not have a business relationship. This contention is premised on a misreading of the district court's opinion. Although the court observed as a matter of historical fact that "the contractual relationship was between [SPC] and CVS," Bisbano, 2013 WL 1907455, at *7, the basis for its decision was that the plaintiff's relationship with CVS "was severed unilaterally by CVS," id. This perspective comports with the reality of relevant events.

The record makes pellucid that the plaintiff had a long-standing relationship with CVS. It makes equally pellucid, however, that CVS ended that relationship prior to the plaintiff's discharge by SPC and that, from then on, CVS wanted no part of the plaintiff. Thus, there was neither an existing nor a prospective business relationship between the plaintiff and CVS when the alleged act of interference took place. The first requirement of the tort was, therefore, lacking. See, e.g., Gifford v. Sun Data, Inc., 686 A.2d 472, 475 (Vt. 1996); see also New England Multi-Unit Hous. Laundry Ass'n v. R.I. Hous. & Mortg. Fin. Corp., 893 F. Supp. 1180, 1193 (D.R.I. 1995).

In an attempt to efface this reasoning, the plaintiff asserts that there is a genuine issue of material fact about whether CVS's decision to exile him was communicated to the defendants. But this is a red herring: the factual dispute to which the plaintiff adverts, even if it exists, is not material. After all, "a fact is 'material' only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996). Even if the defendants never learned of CVS's decision, it remains undisputed that the decision was made and, thus, that any

relationship between CVS and the plaintiff (current or prospective) had evaporated.[3]

For essentially the same reason, the plaintiff cannot make out the fourth element of the tort. The harm that the plaintiff argues he suffered is "the cessation of [the plaintiff's] relationship with CVS." As we have explained, this relationship ended prior to the termination of the plaintiff's employment (and, thus, prior to the alleged act of intentional interference).

That ends this aspect of the analysis. It is a matter of chronology, not a question of disputed fact, that SPC could not have induced CVS to break off a relationship that CVS already had relegated to the scrap heap. Cf. Restatement (Second) of Torts § 766B (1979) (stating that liability attaches if "the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation").

### C. Contract Claims.

We come now to the plaintiff's contract claims. We begin with the plaintiff's assertion that he had a contract guaranteeing

---

[3] Of course, if the defendants never learned of the CVS directive, one might wonder about their motive for terminating the plaintiff's employment. But any such speculation would be irrelevant: even assuming for argument's sake that the defendants had an ulterior motive for ending the employment relationship, the termination could not have had any influence on CVS's prior decision (and, thus, could not have constituted intentional interference).

-11-

his continued employment with SPC.  He describes this contract as either an express oral contract or a contract implied in fact.

The plaintiff's version of this alleged contract has varied from time to time.  In an interrogatory answer, the plaintiff suggested that SPC promised to employ him as long as he continued to bring in CVS business.  In his deposition testimony, he suggested that SPC promised to employ him as long as it continued to do business with CVS.  We need not test the inconsistency between these accounts.  Either way, the plaintiff's version can only be understood in the context of the plaintiff's employment status.

When SPC hired the plaintiff, he was given an employee handbook and acknowledged in writing that, consistent with the provisions of the handbook, his "employment [was] at-will for an indefinite period."  This is of decretory significance because "the firmly established rule in Rhode Island [is] that a contract to render personal services to another for an indefinite term is terminable at the will of either party at any time for any reason or for no reason at all."  Roy v. Woonsocket Inst. for Sav., 525 A.2d 915, 917 (R.I. 1987).

There are telling signs that this acknowledged status did not change over time.  The plaintiff conceded during his deposition that he was always an at-will employee of SPC.  Furthermore, he admitted that he "had no contract."

-12-

Before us, the plaintiff attempts to confess and avoid. Without disputing the foregoing facts, he argues that SPC had the power to alter his employment status and that, over the course of time, it did just that.

To be sure, the district court canvassed two kinds of evidence before rejecting this claim. See Bisbano, 2013 WL 1907455, at *9-10. The first category is composed of a series of e-mails sent to the plaintiff by Strine, encouraging him to solicit CVS business and emphasizing the long-term importance of CVS as a client. After careful review of these e-mails, we conclude, as did the district court, id. at *9, that they do not support the plaintiff's contention that his at-will employment status was altered. Regardless of whether the e-mails are read individually or collectively, they do not suggest, let alone state, that SPC purposed to employ the plaintiff on terms other than at will. Even when stretched to their outer limit, the e-mails are "general expressions of job longevity," insufficient to create a triable issue of fact about the existence of a contract. Brooks v. Hilton Casinos, Inc., 959 F.2d 757, 762-63 (9th Cir. 1992).

The remaining category of evidence is composed of the plaintiff's own testimony regarding his interpretation of assurances that SPC supposedly gave to him about his continued employment. In our view, the plaintiff's interpretation of the alleged assurances is objectively unreasonable and, thus, the

statements cannot carry the weight that the plaintiff loads upon them.

We need not tarry. On this point, the case at hand is on all fours with the decision in Galloway v. Roger Williams University, 777 A.2d 148 (R.I. 2001) (per curiam). There, a university administrator had acknowledged in writing his receipt of an employee manual detailing his at-will status. Id. at 148-49. Subsequently, his superiors told him that he would be re-appointed to his position, and he relied on that assurance in passing up a potential job at another college. Id. at 149. The court affirmed the trial court's summary judgment determination that, in light of the notice that the university had given the plaintiff of his at-will status, his "reliance on the so-called promises of [his superiors] was neither reasonable nor actionable." Id. at 150.

The Rhode Island Supreme Court has taken Galloway to mean that when an individual has received written notice that contradicts a later oral promise, "any reliance on that oral promise [is] unreasonable." Filippi v. Filippi, 818 A.2d 608, 627 (R.I. 2003). That is precisely the situation here.

The plaintiff strives to persuade us that SPC's ostensible promise to continue to employ him "involved more" than was present in Galloway. We are not convinced.

We have ransacked the record in search of such evidence. That search has proven to be fruitless: in this respect, the record

-14-

is as empty as Mother Hubbard's cupboard.  We conclude, therefore, that "the plaintiff's unilateral belief that he had job security is insufficient as a matter of law to create a triable issue of fact." DelSignore v. Providence Journal Co., 691 A.2d 1050, 1052 (R.I. 1997) (per curiam).

There is one loose end: the plaintiff has also asserted a claim for violation of a covenant of good faith and fair dealing. It is axiomatic, however, that such a covenant only comes into existence ancillary to a binding contract.  See Centerville Builders, Inc. v. Wynne, 683 A.2d 1340, 1342 (R.I. 1996) (per curiam).  Inasmuch as we have rejected the plaintiff's contract claims, it follows inexorably that we must likewise reject his claim for breach of an implied covenant of good faith and fair dealing. See, e.g., Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir. 1994) (construing Rhode Island law).

### D.  Misrepresentation.

This leaves the plaintiff's claims for intentional misrepresentation and negligent misrepresentation.  These claims bear a strong family resemblance to each other, especially as presented here.  Consequently, we treat them together.

To recover for intentional misrepresentation — also known in Rhode Island as the tort of deceit — a plaintiff must prove that the defendant knowingly made a false statement, intending to deceive, and induced the plaintiff to rely on it to his detriment.

See Francis v. Am. Bankers Life Assur. Co. of Fla., 861 A.2d 1040, 1046 (R.I. 2004) (per curiam); Katz v. Prete, 459 A.2d 81, 84 (R.I. 1983).  To recover for negligent misrepresentation, a plaintiff must prove that the defendant made an untrue statement of material fact that he either knew or should have known was false (or, at least, made it heedless of its truth or falsity); that the defendant intended the plaintiff to act on the false statement; and that the plaintiff, acting in justifiable reliance on the statement, was injured.  See Zarrella v. Minn. Mut. Life Ins. Co., 824 A.2d 1249, 1257 (R.I. 2003).

In support of his misrepresentation claims, the plaintiff relies on the same evidence — the e-mails and the oral assurances — that we previously surveyed in connection with his contract claims.  For this purpose, the evidence is equally impuissant.

To begin, none of Strine's e-mails contained false assertions.  So, too, Strine's alleged statements to the effect "that as long as [the plaintiff] continued to secure CVS's printing work for [SPC] . . . he would remain employed at the company" were not false: SPC kept the plaintiff on the payroll for as long as he was able to secure CVS business.  It was not until CVS decided that it would no longer traffic with the plaintiff that SPC cut him loose.

-16-

Three additional considerations reinforce our conclusion that the plaintiff's misrepresentation claims fail as a matter of law.

First, the plaintiff has not proffered any facts to support his conclusory statement that he relied on Strine's alleged misrepresentation. What actions he took — such as trying to secure preferred vendor status for SPC — were entirely consistent with doing the job for which the plaintiff was hired and remunerated. Put another way, there is nothing in the record that suggests that the plaintiff would have acted differently had the defendants not made the representations. This, in itself, suffices to defeat his claim of detrimental reliance. See, e.g., Hinchey v. NYNEX Corp., 144 F.3d 134, 146 (1st Cir. 1998); Asermely v. Allstate Ins. Co., 728 A.2d 461, 464 (R.I. 1999) (per curiam).

Second, the plaintiff has wholly failed to show that any such reliance would have been reasonable. See supra Part IIC; see also Galloway, 777 A.2d at 150. As one court put it in analogous circumstances involving an at-will employee, "[the employers] did no more than express their expectation that the person hired would enjoy long-term employment. Their representation was made to 'sell' [the plaintiff] on their company, not to guide him with professional employment advice. The tort of negligent misrepresentation simply has no application under these circumstances." Fry v. Mount, 554 N.W.2d 263, 267 (Iowa 1996).

Third, even if the plaintiff had reasonably relied on SPC's statements — and we emphasize that there is no basis for concluding that he did — he has not adduced a shred of proof that such reliance was detrimental. In this regard, he argues only that his reliance caused him "the loss of his relationship with CVS as well as the loss of prospective commissions." But these losses, by any leap of even the most agile imagination, cannot be said to flow from the plaintiff's reliance on SPC's representations. The losses unarguably flowed from CVS's discovery of the plaintiff's corrupt relationship with a CVS official and CVS's ensuing decision to sever all ties with the plaintiff. Seen in this light, the plaintiff was the author of his own misfortune.[4]

## III.  CONCLUSION

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**

---

[4] The mere fact that Strine's representations may have induced the plaintiff to continue working for SPC does not prove that the representations were the cause of the losses about which he now complains. See, e.g., Sparks v. Fid. Nat'l Title Ins. Co., 294 F.3d 259, 273 (1st Cir. 2002); Restatement (Second) of Torts § 548A (1977).